**Affirmed as Modified and Opinion filed March 29, 2012.**



In The

# Fourteenth Court of Appeals

—————————

## NO. 14-09-00907-CV

—————————

## ENERGY MAINTENANCE SERVICES GROUP I, LLC, TIM NESLER, ART ROBBINS, AND HARVEY SCHNITZER, Appellants

## V.

## JIM SANDT AND ROXANNE SANDT, Appellees

On Appeal from the 400th District Court
Fort Bend County, Texas
Trial Court Cause No. 05-DCV-145487A

## OPINION

This appeal arises out of a judgment based upon claims for statutory fraud under Chapter 27 of the Texas Business and Commerce Code. The trial court rendered judgment in favor of a husband and wife based upon a favorable jury verdict on their statutory-fraud claims against various defendants. On appeal, the defendants challenge the legal and factual sufficiency of the evidence to support various jury findings. We conclude that the evidence is legally insufficient to support the statutory-fraud liability

finding as to one individual defendant; but, based upon the unchallenged conspiracy findings, we affirm the judgment against that defendant, except for the award of exemplary damages, which we delete. Because the evidence is legally insufficient to support a judgment in favor of the wife, we modify the trial court's judgment to delete all awards in her favor. We reject the remaining arguments necessary to the disposition of this appeal. With the noted modifications to the trial court's judgment, we affirm.

## I. FACTUAL AND PROCEDURAL BACKGROUND

Appellee Jim Sandt is a certified public accountant who worked for Enron for twenty-three years. When he left Enron in 2005, Jim was a vice president in Enron's tax group. In December 2001, Enron filed for bankruptcy protection. Jim became aware that many Enron assets were being sold and that some of the assets might be purchased at a low price relative to their value. By himself, Jim was not able to buy Enron assets that had substantial value, but Jim was interested in the possibility of joining with others in an attempt to buy one or more Enron assets.

In March 2002, Jim and his wife, appellee Roxanne Sandt, met appellant Tim Nesler, and his wife Melinda. The Sandts and the Neslers quickly became friends. The Sandts traveled to Aruba with the Neslers and stayed at the Neslers' condominium there. Jim and Tim began working on a business plan with the idea of buying an Enron business and then managing it. In the spring of 2003, Jim and Tim started meeting in Tim's Houston apartment. Appellant Art Robbins and Sumner "Buzz" White soon joined the group. The group members sometimes referred to the group as the "EMS Group." The group members did not sign a partnership agreement or a confidentiality agreement. Jack Simunek and Bob Rosen joined the group in the summer of 2003. In July 2003, Jim created a Texas company named Energy Maintenance Services Group, L.L.C. ("Energy Maintenance Texas"). The filing states that this company is to be managed by its members, who include Jim, Tim, Art, and Buzz. Jim gave testimony indicating that the members of the EMS Group formed an oral partnership.

The group started looking for Enron assets to pursue. Jim was still working for

2

Enron at this time. The group become interested in Hanover Measurement Services Company, L.P. ("Hanover"), a limited partnership in which Enron North America Corporation and Hanover Compressor Company, Inc. ("Hanover Compressor") were the two limited partners. Jim was familiar with Hanover from his work at Enron. Jim believed that Enron North America's interest in Hanover could be purchased at auction in the bankruptcy proceeding for approximately $5 million. Financial analysis performed in September 2003 indicated that this interest was worth between $30 million and $87 million. It was decided that the six men in the group (Jim, Tim, Art, Buzz, Jack, and Bob) would invest $400,000 that would be used to fund part of the purchase price. Jim, Tim, Art, and Buzz each would invest $75,000. Jack and Bob each would invest $50,000. The money was to be invested in October 2003. The plan was for banks or other financial institutions to fund the remainder of the money needed for the purchase. According to Jim, during this period Tim served as Chief Executive Officer ("CEO") of the EMS Group, and Jim served as the Chief Financial Officer ("CFO"), while still working at Enron.

On September 24, 2003, certificates of formation were filed for Energy Maintenance Services Group I, L.L.C. ("Energy Maintenance"), a Delaware limited liability company and its subsidiary, EMS Pipeline Services, L.L.C. ("Pipeline Services"), a Delaware limited liability company. In the same month, Jim became very nervous and concerned that he might have a conflict of interest because he was still working at Enron and yet he also was CFO in a group that was seeking to buy Enron North America's interest in Hanover. Jim also was concerned that if the group's bid were successful and they were in the process of acquiring this interest in Hanover, an objection might be raised if it was apparent that Jim was involved with the bidder, because the perception might be that Jim had access to nonpublic information through his job at Enron that would help determine the right bid amount. Jim was nervous that his involvement would result in the loss of the opportunity for the EMS Group to buy Enron North America's interest in Hanover. These concerns were aired through many conversations Jim had with Tim, who tried to convince Jim that there was no problem. At Tim's suggestion, Jim talked to a lawyer, who advised

3

that Jim did not have a conflict of interest. The lawyer reassured Jim that he did not have a conflict of interest, but Jim was still convinced that his presence as CFO might jeopardize the success of the bid. Tim pleaded with Jim not to resign his position as CFO. Nonetheless, on September 30, 2003, Jim resigned from all positions that he held at Energy Maintenance Texas, Energy Maintenance, and Pipeline Services.

According to Jim, Tim was furious and very upset about Jim's resignation. Tim did not believe that Jim's presence was a problem and feared that Jim's resignation might jeopardize the bid. Tim promptly contacted appellant Harvey Schnitzer, who took Jim's place as CFO. A few days after this resignation, Jim sent an email to lawyers representing Energy Maintenance, informing them of his resignation effective September 30, 2003. Jim told these lawyers that "[i]n addition, I also relinquish all economic interest in [Energy Maintenance Texas, Energy Maintenance, and Pipeline Services.]" At this time, Jim had not yet made the contemplated $75,000 investment. Jim testified that he continued to work on financial aspects of the deal in the background after his resignation but that he played a "lesser role" after his resignation.

In October 2003, Jim tendered his anticipated contribution of $75,000. On December 11, 2003, Jim, Tim, Art, and Harvey met at a lawyer's office to sign various documents. Effective December 11, 2003, Tim and Art, as the two directors of Energy Maintenance, executed a "Written Consent of Board of Directors in lieu of Organizational Meeting," reflecting that (1) Tim, Harvey, Art, and Buzz were elected officers of Energy Maintenance; (2) Jim was a "Membership Interest Unit Holder," who had contributed $75,000 and who held 75 of 400 units of Energy Maintenance. Jim also signed a "Limited Liability Company Agreement" for Energy Maintenance, dated as of December 11, 2003 ("LLC Agreement"). Tim, Art, Buzz, Jack, and Bob also signed the LLC Agreement. Under this agreement, (1) Jim was a member of Energy Maintenance, who owned 75 of the 400 outstanding units based upon his contribution of $75,000; (2) "in connection with the issuance of new Units by the Company," new members of Energy Maintenance may be admitted; and (3) all proposed amendments to the LLC agreement must be submitted to all

4

members of Energy Maintenance in writing and approved by members who in the aggregate own more than fifty percent of the outstanding units in Energy Maintenance. Nothing in the LLC Agreement describes how new units, beyond the initial 400 units, may be issued.[1] Jim also signed a subscription agreement with Energy Maintenance under which Jim irrevocably subscribed to invest solely for his own account in 75 units of Energy Maintenance based upon his payment of $75,000.

Five days later, on December 16, 2003, without notice to Jim and without having submitted the proposed amendments to Jim, the other five members of Energy Maintenance (Tim, Art, Buzz, Jack, and Bob) approved various amendments to the LLC Agreement. One of these amendments gave the Board of Directors (Tim and Art) authority to issue, sell, and deliver units of Energy Maintenance, options, warrants, and other rights to acquire units of Energy Maintenance, "for such consideration as it may determine in its sole discretion." The next day, Pipeline Services and Enron North America signed an agreement for Pipeline Services to buy Enron's interest in Hanover, subject to several conditions, including bankruptcy court approval.

According to the 2004 and 2005 financial statements of Energy Maintenance, Energy Maintenance issued more than 1,200 additional units in 2003 beyond the original units referenced in the documents that Jim signed at the meeting in the lawyer's office in December 2003. There was testimony at trial that these additional units included 400 additional Energy Maintenance units each to Tim, Art, and Buzz. Later in that month, on December 29, 2003, Art hosted a holiday party for the Energy Maintenance members. None of the other Energy Maintenance members at the party told the Sandts about the amendment to the LLC Agreement that had been approved less than two weeks earlier.

In February 2004, Pipeline Services closed its purchase of Enron North America's interest in Hanover. In the same month, Jim received a K-1 form from Energy

---

[1] The EMS Parties argue that, under section 9.3 of the LLC Agreement, the Board of Directors could issue new units in its sole discretion. Though the LLC Agreement does provide that any new member must be approved by the Board of Directors in its sole discretion, this provision addresses approval of new members, not issuance of new units.

Maintenance's accounting firm stating that Jim owned 18.84% of Energy Maintenance. In March 2004, Pipeline Services bought the remaining interest in Hanover that was not owned by Enron North America. According to Jim, in 2004, he tried to obtain information about his investment from Tim, but his efforts were unsuccessful.

In April 2005, Jim received a K-1 form stating that he owned 5.26% of Energy Maintenance. The following month, Jim received a 2004 Financial Statement, stating that Energy Maintenance issued more than 1,200 additional units in 2003 beyond the original units set forth in the documents that Jim had signed at the December 2003 meeting in the lawyer's office.

Jim and Roxanne sued Energy Maintenance, Tim, Art, and Harvey (hereinafter collectively the "EMS Parties"), asserting (1) oral partnership, (2) informal fiduciary duty, (2) breach of fiduciary duty, (3) breach of oral contract, (4) statutory fraud under Chapter 27 of the Texas Business and Commerce Code, (5) common law fraud, (6) negligent misrepresentation, and (7) civil conspiracy. The jury found against the Sandts regarding the existence of an oral partnership. Though the jury found that Tim and Art entered into an oral contract with the Sandts as to certain matters, the jury found that the Sandts did not meet their burden of proving a breach of the oral agreements. The jury found that Tim breached a fiduciary duty to the Sandts and found against Tim, Art, and Energy Maintenance on the claims for statutory fraud, common law fraud, and negligent misrepresentation. The jury found that all of the EMS Parties, including Harvey, were part of a conspiracy. The jury found $780,000 in actual damages. The jury also assessed exemplary damages of $300,000 against Tim and Energy Maintenance and $50,000 against Art, finding that Tim and Art were acting as vice principals of Energy Maintenance. The trial court rendered judgment on the jury's verdict.

## II. ISSUES PRESENTED

On appeal, the EMS Parties assert that (1) the evidence is legally and factually

6

insufficient to support the jury findings that Tim, Art, or Energy Maintenance committed statutory fraud against the Sandts (first through sixth issues and thirteenth through eighteenth issues); (2) the evidence is legally and factually insufficient to support the jury findings that Tim, Art, or Energy Maintenance committed statutory fraud against the Sandts with actual awareness of the falsity of the representation or promise (seventh through twelfth issues and nineteenth through twenty-fourth issues); (3) the evidence is legally and factually insufficient to support the jury's findings that Tim and Art entered into an oral agreement that Sandts' pro rata share of Energy Maintenance would not be diluted or changed without a member paying cash for the units to be contributed as capital to Energy Maintenance (twenty-fifth issue); (4) the jury's answers regarding damages, vice principal, exemplary damages, and attorney's fees should be disregarded because of the court's reversal of the liability findings on statutory fraud (twenty-sixth issue); and (5) the evidence is legally and factually insufficient to support the jury's answer to Question 14 regarding actual damages because that answer was based upon a legally incorrect measure of damages (twenty-seventh issue).

### III.  STANDARDS OF REVIEW

On appeal, the EMS Parties challenge the legal and factual sufficiency of the evidence supporting various jury findings.  When reviewing the legal sufficiency of the evidence, we consider the evidence in the light most favorable to the challenged finding and indulge every reasonable inference that would support it.  *City of Keller v. Wilson,* 168 S.W.3d 802, 823 (Tex. 2005).  We must credit favorable evidence if a reasonable factfinder could and disregard contrary evidence unless a reasonable factfinder could not. *See id.* at 827. We must determine whether the evidence at trial would enable reasonable and fair-minded people to find the facts at issue.  *See id.*  The factfinder is the only judge of witness credibility and the weight to give to testimony.  *See id.* at 819.

When reviewing a challenge to the factual sufficiency of the evidence, we examine the entire record, considering both the evidence in favor of, and contrary to, the challenged

7

finding. *Cain v. Bain*, 709 S.W.2d 175, 176 (Tex. 1986). After considering and weighing all the evidence, we set aside the fact finding only if it is so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust. *Pool v. Ford Motor Co.*, 715 S.W.2d 629, 635 (Tex. 1986). The trier of fact is the sole judge of the credibility of the witnesses and the weight to be given to their testimony. *GTE Mobilnet of S. Tex. v. Pascouet*, 61 S.W.3d 599, 615–16 (Tex. App.—Houston [14th Dist.] 2001, pet. denied). We may not substitute our own judgment for that of the trier of fact, even if we would reach a different answer on the evidence. *Maritime Overseas Corp. v. Ellis*, 971 S.W.2d 402, 407 (Tex. 1998). The amount of evidence necessary to affirm a judgment is far less than that necessary to reverse a judgment. *Pascouet*, 61 S.W.3d at 616.

## IV. ANALYSIS

### A. Is the evidence legally and factually sufficient to support the jury's finding that Tim committed statutory fraud against Jim?

In their first and thirteenth issues, the EMS Parties assert that the evidence is legally and factually insufficient to support the jury's determination in response to Question 9a that Tim committed statutory fraud against Jim. The jury impliedly found that (1) Tim made a false, material promise to Jim to do an act with the intention of not fulfilling the promise, (2) Tim made the promise to Jim for the purpose of inducing Jim to enter into an agreement to purchase stock, and (3) Jim relied on the promise in entering into an agreement to purchase stock.

Jim testified as follows:

Q. Did you rely upon Tim's representation that you're putting your money in, and you're going to be just as equal as anybody else that gave $75,000?

A. [Jim:] The only reason that I put my money into the partnership is I relied on the information that Tim told me, that my ownership percentage would be based upon the ratio, my $75,000 divided by 400 bucks — $400,000.

. . .

8

Q.      Let me ask you something: If you knew on December the 12th, when you're there to sign the original documents that are consistent with what you thought, that the real deal was what they were going to put together five days later in the secret meeting, would you have still okayed the deal?

A.      [Jim:] Absolutely not. I relied on the information that I got, I received from Tim, that we would have our 18.84 percent investment in the partnership by our capital, by our contribution of our $75,000.

On December 16, 2003, within five days after Sandt signed documents that confirmed this ownership regime, the five members of Energy Maintenance other than Jim (Tim, Art, Buzz, Jack, and Bob) approved amendments to the LLC Agreement that gave the Board of Directors the power to issue, sell, or deliver new units under such terms and conditions and for such consideration as the Board may determine in its sole discretion. Based upon the trial testimony, the jury reasonably could have found as follows:

- Tim promised Jim that if Jim invested $75,000 in Energy Maintenance, Jim would receive an ownership interest of approximately 18.75%.

- Tim made this promise to Jim for the purpose of inducing Jim to enter into an agreement to purchase the units in Energy Maintenance.

- Tim's promise was material, and Jim relied on the promise in agreeing to purchase the units.

- Even though the LLC Agreement required that proposed amendments to that agreement be submitted to all members and even though Jim was a member of Energy Maintenance, the proposed amendments that the other five members approved on December 16 were not submitted to Jim.

- Within fifteen days of approving these amendments, the Board of Directors (Tim and Art) issued 400 additional units each to Tim, Art, and Buzz as "sweat equity" without these members giving any additional consideration.[2]

---

[2] The record contains conflicting evidence on this point. Energy Maintenance's audited financial statements for 2004 and 2005 contain a statement in the notes that Energy Maintenance issued more than 1,200 additional units in 2003 to certain founders directly involved in management of the company. Art testified that this statement refers to "sweat equity units," that Tim, Art, and Buzz received without contributing any capital. Other than these two financial statements, the trial evidence does not contain any documents regarding these additional units, such as certificates for the units or corporate consents regarding

9

- Tim was furious with Jim for resigning from the management team at a crucial juncture in the attempt to buy the interests in Hanover. Tim believed that the concerns that motivated Jim to resign did not justify Jim's decision to resign.

- Tim falsely promised that Jim would receive an ownership interest of approximately 18.75%, even though Tim intended that Jim receive a significantly lower ownership interest that would result after issuance of the 1,200 additional units in December 2003. Tim did not tell Jim anything about the plan to issue these units.

- Tim promised that that if Jim invested $75,000 in Energy Maintenance, Jim would receive an ownership interest of approximately 18.75%, with no intention of fulfilling the promise.[3]

The EMS Parties note that the Sandts asserted at trial that Tim and Art had entered into an oral partnership with them. The EMS Parties assert that in response to Question 1, the jury found that no oral partnership ever existed. This assertion is incorrect. Though the jury did answer "no" to this question, the proper interpretation of the jury's answer is that the jury found the Sandts did not prove by a preponderance of evidence that Tim or Art entered into an oral partnership with the Sandts. *See Sterner v. Marathon Oil Co.*, 767 S.W.2d 686, 690 (Tex. 1989); *C. & R. Transport, Inc. v. Campbell*, 406 S.W.2d 191, 194 (Tex. 1966); *Kormanik v. Seghers*, —S.W.3d—,—, 2011 WL 2322369, at *10 (Tex. App.—Houston [14th Dist.] June 14, 2011, no pet. h.).

the issuance of these units. Bob testified that he was aware that in December 2003, some members received an additional 1,200 units based upon the completion of certain milestones. Contrary to this evidence as to when the 1,200 units were issued, Harvey and Art both testified that these units were approved in March 2004 and issued in October 2004, rather than in December 2003. But, as factfinder, the jury had the prerogative to disbelieve the testimony contrary to the evidence that the 1,200 units were issued in December 2003. *See Kormanik v. Seghers*, —S.W.3d—,—, 2011 WL 2322369, at *7 (Tex. App.—Houston [14th Dist.] June 14, 2011, no pet. h.); *Duruji v. Duruji*, No. 14-05-01185-CV, 2007 WL 582282, at *5 (Tex. App.—Houston [14th Dist.] Feb. 27, 2007, no pet.) (mem. op.).

[3] During his trial testimony, Tim denied that he made any promise to Jim. Tim's denial that he ever made a promise is a factor showing no intent to perform when Tim made the promise. *See Spoljaric v. Percival Tours, Inc.*, 708 S.W.2d 432, 435 (Tex. 1986); *W&F Transp., Inc. v. Wilhelm*, 208 S.W.3d 32, 48 (Tex. App.—Houston [14th Dist.] 2006, no pet.).

10

The jury found that the Sandts had failed to prove an oral partnership, and there is no evidence of any written partnership agreement. In this context, the EMS Parties suggest that Jim's references to the "partnership" in his testimony should not be considered as evidence in support of his claim for statutory fraud regarding his purchase of 75 units in Energy Maintenance, which is a limited liability company. Though in his testimony Jim did refer sometimes to an "oral partnership," most of the time when Jim referred to a partnership, he used the term "partnership" rather than "oral partnership." Jim referred to units of Energy Maintenance as "partnership interests." Jim referred to the LLC Agreement as the "partnership agreement." Jim testified that after he reviewed Energy Maintenance's 2004 financial statement, he learned that Energy Maintenance had issued more than 1,200 additional units in 2003. Jim testified that the issuance of these units reduced his "interest in the partnership."[4] Energy Maintenance is a partnership for tax purposes. In addition, people involved in business sometimes use the word "partnership" to refer to entities that are actually corporations or other entities rather than partnerships. The jury reasonably could have interpreted Jim's references to the "partnership" as references to Energy Maintenance.[5]

The jury found that Tim and Art entered into an oral agreement that Jim's pro rata share of Energy Maintenance would not be diluted or changed without a member paying

---

[4] The EMS Parties argue it was necessary for the Sandts to cast their testimony in terms of an alleged oral partnership rather than a limited liability company because Jim had relinquished all economic interest in Energy Maintenance by his October 2, 2003 email to certain lawyers working for Energy Maintenance. The EMS Parties have not explained how this email would preclude Jim from asserting claims based upon his ownership of units in Energy Maintenance, given that after this email was sent, Jim tendered the $75,000, executed the subscription agreement, and became a member of Energy Maintenance and a holder of units in the company.

[5] The EMS Parties cite *Service Corporation International v. Guerra*. *See* 348 S.W.3d 221, 229–30 (Tex. 2011). In that case, the court held that, under the record presented, testimony that workers were employed by "SCI" only allowed for speculation as to whether the workers were employed by SCI Texas Funeral Services, Inc. or its parent corporation Service Corporation International. *See id*. Thus, the court held that such evidence was legally insufficient as to whether the corporate parent employed the workers. *See id*. The nature of the testimony and the evidence in the case under review is substantially different, and the issue raised by the EMS Parties is whether certain testimony pertains only to an alleged oral partnership or to a limited liability company that unquestionably exists. The *Service Corporation International* case is not on point.

cash for the additional units to be contributed as capital to Energy Maintenance. The EMS Parties note that the jury refused to find that Tim or Art failed to comply with this oral agreement. The Sandts elected to recover judgment under their statutory-fraud claims, and did not seek judgment under their oral-contract claim. The jury's finding that the Sandts did not prove by a preponderance of evidence that Tim or Art breached this oral agreement, and the Sandts' failure to challenge this finding on appeal do not prevent the Sandts from seeking judgment on their statutory-fraud claims and defending that judgment on appeal.

The EMS Parties also argue that Jim never testified that any person told him that he always would have an eighteen-percent interest. But, under the evidence as discussed above, the jury reasonably could have concluded that Jim's ownership interest was diluted at the threshold in December 2003, and that Tim intended that Jim receive a diminished ownership interest that would result after issuance of the 1,200 additional units in December 2003.

The EMS Parties assert that, to recover under a fraud claim based upon section 27.01 of the Texas Business and Commerce Code, entitled "Fraud in Real Estate and Stock Transactions," a plaintiff must prove justifiable reliance, rather than mere reliance. *See* Tex. Bus. & Comm. Code § 27.01 (West 2012); *Rich v. Olah*, 274 S.W.3d 878, 887 (Tex. App.—Dallas 2008, no pet.). We presume, without deciding, that this is a correct statement of law. The EMS Parties argue that the evidence is legally insufficient to show that Jim's reliance was justifiable. But the jury charge did not require that the reliance be justifiable; therefore, in measuring the sufficiency of the evidence, we do not consider whether there is sufficient evidence of justifiable reliance.[6] *See Osterberg v. Peca*, 12 S.W.3d 31, 55 (Tex. 2000) (holding that court could not review the sufficiency of the evidence based on a particular legal standard because that standard was not submitted to the jury and no party objected to the charge on this ground or requested that the jury be

---

[6] In any event, even if that issue were relevant, we would conclude that the record contains legally and factually sufficient evidence of justifiable reliance by Jim.

charged using this standard); *Texas First Nat. Bank v. Ng,* 167 S.W.3d 842, 855–56 (Tex. App.—Houston [14th Dist.] 2005, judgm't vacated w.r.m.) (holding party waived argument that evidence was insufficient to support finding of justifiable reliance because jury charge did not require justifiable reliance and no objection was lodged in this regard). Instead, we measure sufficiency based upon the standard contained in the jury charge.

Considering the evidence in the light most favorable to the challenged finding, indulging every reasonable inference that would support it, crediting favorable evidence if reasonable jurors could, and disregarding contrary evidence unless reasonable jurors could not, we conclude that the trial evidence would enable reasonable and fair-minded people to find that (1) Tim made a false, material promise to Jim to do an act with the intention of not fulfilling the promise, (2) Tim made the promise to Jim for the purpose of inducing Jim to enter into an agreement to purchase stock, and (3) Jim relied on the promise in entering into an agreement to purchase stock.[7] *See City of Keller,* 168 S.W.3d at 823, 827. Therefore, the evidence is legally sufficient to support the jury's finding in answer to Question 9a. Because the jury reasonably could have concluded that Tim was acting as an agent of Energy Maintenance when he engaged in the foregoing tortious conduct, under the charge the evidence is also legally sufficient to support the jury's finding in answer to Question 9c that Energy Maintenance committed statutory fraud.

Examining the entire record, considering both the evidence in favor of, and contrary to, the challenged findings, and considering and weighing all the evidence, we conclude that the jury's answers to Questions 9a and 9c are not so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust. *See Pool*, 715 S.W.2d at 635.

Therefore, we overrule the EMS Parties' first, third, thirteenth, and fifteenth issues.

---

[7] We need not and do not address the sufficiency of the evidence regarding the jury's implied finding that Tim committed statutory fraud by making a false representation of a past or existing fact.

13

**B.** **Is the evidence legally and factually sufficient to support a finding that Tim had actual awareness of the falsity of his promise?**

In their seventh and nineteenth issues, the EMS Parties assert that the evidence is legally and factually insufficient to support the jury's determination in response to Question 10a that Tim had actual awareness of the falsity of the representation or promise that the jury found to be fraudulent in response to Question 9a. At trial, Jim testified as follows:

- Even though the LLC Agreement required that proposed amendments to that agreement to be submitted to all members and even though Jim was a member of Energy Maintenance, the proposed amendments that the other five members approved on December 16 were not submitted to Jim.

- Jim received no notice that amendments to the LLC Agreement were being considered in December 2003 and had no opportunity to approve or disapprove the proposed amendments.

- The first time Jim ever saw the amended LLC Agreement and the documents relating to this amended agreement was in 2005, eighteen months after the LLC Agreement was amended.

- Jim asked Tim why Jim had not been notified of the proposed amendments. Tim said that (a) there had been a meeting; (b) they tried to contact Jim but were unsuccessful; (c) they held the meeting without Jim; (d) a vote was held, and Tim voted "no" on Jim's behalf; and (e) the amendments were approved.

- Jim had no knowledge in December 2003 that this meeting was taking place.

- Nobody told Jim about the December 2003 meeting. At the holiday party less than two weeks later, none of the other Energy Maintenance members told the Sandts about this meeting or the amendments to the LLC Agreement.

- Jim contacted Tim at various times in 2004 to seek information about his investment. Though Tim did respond, Jim was not satisfied with Tim's responses, and Tim did not tell Jim about the amendments to the LLC Agreement at any time in 2004.

We already have held that the evidence is legally and factually sufficient to support

14

a finding by the jury that (1) Tim made a false, material promise to Jim to do an act with the intention of not fulfilling the promise and (2) Tim made the promise to Jim for the purpose of inducing Jim to enter into an agreement to purchase stock. Considering the evidence in the light most favorable to the challenged finding, indulging every reasonable inference that would support it, crediting favorable evidence if reasonable jurors could, and disregarding contrary evidence unless reasonable jurors could not, we conclude that the trial evidence would enable reasonable and fair-minded people to find that Tim had actual awareness of the falsity of his promise to Jim. *See City of Keller,* 168 S.W.3d at 823, 827; *CA Partners v. Spears*, 274 S.W.3d 51, 72–75 (Tex. App.—Houston [14th Dist.] 2008, pet. denied) (holding evidence was legally and factually sufficient to support finding that party had actual awareness of the falsity, deception, or unfairness of the misrepresentation that gave rise to the consumer's claim for the party's violation of the Deceptive Trade Practices Act); *SMB Partners, Ltd. v. Osloub*, 4 S.W.3d 368, 372–73 (Tex. App.—Houston [1st Dist.] 1999, no pet.) (holding evidence was factually sufficient to support finding that defendant had actual awareness of the falsity of the representation by which defendant committed statutory fraud in violation of Texas Business and Commerce Code section 27.01(a)). Therefore, the evidence is legally sufficient to support the jury's finding in answer to Question 10a. Because the jury reasonably could have concluded that Tim was acting as an agent of Energy Maintenance when he engaged in the foregoing tortious conduct, under the charge the evidence is also legally sufficient to support the jury's finding in answer to Question 10c that Energy Maintenance had actual awareness of the falsity of the promise to Jim.

Examining the entire record, considering both the evidence in favor of, and contrary to, the challenged findings, and considering and weighing all the evidence, we conclude that the jury's answers to Questions 10a and 10c are not so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust. *See Pool*, 715 S.W.2d at 635.

Therefore, we overrule the EMS Parties' seventh, ninth, nineteenth, and twenty-first issues.

15

**C.** **Is the evidence legally sufficient to support a finding that one of the EMS Parties committed statutory fraud against Roxanne?**

In their fourth, fifth, and sixth issues, the EMS Parties assert that the evidence is legally and factually insufficient to support the jury's findings in response to Questions 9a, 9b, and 9c that Tim, Art, and Energy Maintenance committed statutory fraud against Roxanne. Under the jury charge, for Tim, Art, or Energy Maintenance to have committed statutory fraud against Roxanne, the record evidence would have to show that Roxanne relied on a false representation or a false promise by the defendant in question in entering into an agreement to purchase stock. Jim signed the subscription agreement on December 12, 2003; Roxanne did not. This agreement contained an admonition that, if any representation made by Jim in the agreement were false, Jim and Energy Maintenance could be found to be in violation of federal and state securities laws. Under the unambiguous language of this agreement:

- Jim irrevocably subscribed to purchase seventy-five units in Energy Maintenance for $75,000.

- In reliance upon Jim's representations and warranties, Energy Maintenance accepted this subscription.

- Jim represented and warranted to Energy Maintenance that he was subscribing to invest in Energy Maintenance solely for his own account.

- Jim represented and warranted to Energy Maintenance that he was not acquiring the units "as an agent or otherwise for any other person."

- Jim represented and warranted to Energy Maintenance that he was acquiring the units solely for his own beneficial account.

Jim executed this agreement as an individual and solely in his name. Under the agreement, the signature of any joint subscriber was required for "joint accounts." Roxanne did not sign in the space provided. Under the unambiguous language of the subscription agreement, Roxanne was not a party to the agreement. We conclude that the

16

evidence is legally insufficient to show that Roxanne entered into an agreement to purchase stock, which is an essential element for her to recover under the statutory-fraud claim. Considering the evidence in the light most favorable to the challenged finding, indulging every reasonable inference that would support it, crediting favorable evidence if reasonable jurors could, and disregarding contrary evidence unless reasonable jurors could not, we conclude that the trial evidence would not enable reasonable and fair-minded people to find that Roxanne relied on a false representation or a false promise in entering into an agreement to purchase stock. *See City of Keller,* 168 S.W.3d at 823, 827.

The Sandts argue that the EMS Parties have waived their argument that Roxanne cannot recover against them. The Sandts note that in the jury charge, the trial court defined "Sandt" as "Jim Sandt and/or Roxanne Sandt unless otherwise noted." In Question 9, the trial court asked the jury whether various defendants committed statutory fraud against "Sandt," and the EMS Parties did not object to the form of the charge. The EMS Parties argue that the Sandts failed to preserve error as to the inclusion of both Jim and Roxanne in the definition of "Sandt" in the charge. The EMS Parties have waived any alleged charge error in the definition of "Sandt" or in the failure of the trial court to require the jury to answer separate liability questions as to Jim and Roxanne. But, the EMS Parties have not asserted either of these arguments on appeal. We review the sufficiency of the evidence under the charge given and we presume the jury found that the defendants in question committed statutory fraud against both Jim and Roxanne. But this presumption does not prevent the EMS Parties from arguing that the evidence is legally insufficient to support the findings that Tim, Art, and Energy Maintenance committed statutory fraud against Roxanne.

The Sandts also argue that the evidence is legally sufficient based upon evidence that the $75,000 Jim used to invest in Energy Maintenance was community property. We presume that these funds were community property. Thus, as a person having an interest in these funds, Roxanne had the right to recover in tort against a party who stole these funds. *See Chu v. Hong*, 249 S.W.3d 441, 445 (Tex. 2008). In such a case, Roxanne

would be suing based upon her own interest in the property stolen. But, the Sandts have not cited and research has not revealed any case in which a court has held that a spouse's interest in community funds expands the substantive law and allows the spouse to recover based upon tort claims against third parties that only run in favor of the other spouse. Under the facts of this case, to recover under the statutory-fraud claim, Roxanne must have entered into an agreement to purchase stock. If there is no legally sufficient evidence that Roxanne entered into such an agreement, Jim's use of community funds to buy the units does not allow Roxanne to recover for statutory fraud without making the required showing.

The Sandts cite *Forgetaboutit, Inc. v. Warner*. *See* No. 09-04-503-CV, 2005 WL 3219578, at *3 (Tex. App.—Beaumont Dec. 1, 2005, no pet.). In that case the defendant asserted a jurisdictional argument on appeal, claiming that the plaintiff-wife lacked standing because the unincorporated business with whom the defendant dealt was the separate property of the husband. *See id.* The appellate court concluded that the business was community property and therefore the wife had standing. *See id.* The *Forgetaboutit* case did not deal with the sufficiency of the evidence to support any claim in favor of the wife and therefore is not on point. *See id.*

Concluding that the evidence is legally insufficient to support the jury's implied findings that Roxanne relied on a false representation or a false promise by Tim, Art, or Energy Maintenance in entering into an agreement to purchase stock, we sustain the fourth, fifth, and sixth issues.[8] Accordingly, we modify the trial court's judgment to delete any recovery by Roxanne.[9]

---

[8] Therefore, we need not and do not address the tenth, eleventh, twelfth, sixteenth, seventeenth, eighteenth, twenty-second, twenty-third, and twenty-fourth issues.

[9] If, on original submission, a plaintiff briefs issues relating to the plaintiff's election of alternative theories of recovery under the *Boyce Iron Works* case, this court may address these issues on original submission. *See Boyce Iron Works, Inc. v. Southwestern Bell Telephone Co.*, 747 S.W.2d 785, 787 (Tex. 1988) ("When the jury returns favorable findings on two or more alternative theories, the prevailing party need not formally waive the alternative findings. That party may seek recovery under an alternative theory if the judgment is reversed on appeal"); *Hatfield v. Solomon*, 316 S.W.3d 50, 60 n.3 (Tex. App.—Houston [14th

**D.** **Is the evidence legally or factually insufficient to support the jury's damage finding because the finding is based upon a legally incorrect measure of damages?**

In their twenty-seventh issue, the EMS Parties argue that the evidence is legally and factually insufficient to support the jury's answer to Question 14 regarding actual damages because that answer was based upon a legally incorrect measure of damages. The EMS Parties assert that under the correct measure of damages, the evidence is legally and factually sufficient. According to the EMS Parties, the correct measure of damages was either the out-of-pocket measure of damages or the benefit-of-the-bargain measure of damages. Presuming that Texas law limits Jim to actual damages under one of these two measures, the trial court did not instruct the jury to base its damages finding upon either of these measures of damages, and no party objected to the form of Question 14. Therefore, the legal and factual sufficiency of the evidence is not determined based upon these measures of damages. *See Equistar Chemicals, L.P. v. Dresser-Rand Co*., 240 S.W.3d 864, 868 (Tex. 2007) (holding that defendant failed to preserve error on argument that jury's damage finding was based upon improper measure of damages); *Osterberg*, 12

Dist.] 2010, no pet.) (stating that *Boyce Iron Works* election of alternative theory of recovery may be addressed on original submission if briefed by the parties). The Sandts have briefed certain conditional elections in their appellees' brief, and the EMS Parties have responded in their reply brief. But, in their conditional cross-point and argument thereunder, the Sandts presume that their statutory-fraud judgment will either stand as to Jim and Roxanne or fall as to both. The Sandts do not address their election if the judgment stands as to Jim and falls as to Roxanne. The trial court's judgment is a joint judgment with a single recovery by both spouses. Roxanne has not briefed the issues relating to an alternative judgment in her favor under common-law fraud or negligent misrepresentation with Jim still recovering judgment based upon statutory fraud. Roxanne has not addressed (1) whether the same issue that rendered the evidence legally insufficient as to Roxanne under statutory fraud renders the evidence legally insufficient as to Roxanne's other two claims; or (2) whether the Sandts may recover jointly for the same loss but in different amounts under different claims. We conclude that the Sandts have not briefed an election of alternative theories in the event that this court affirms the trial court's judgment as to a statutory-fraud recovery by Jim but concludes that Roxanne cannot recover under statutory fraud. Therefore, on original submission, we do not address any *Boyce Iron Works* election by Roxanne as to her other claims. *See Hatfield*, 316 S.W.3d at 60 n.3; *Beal Bank, S.S.B. v. Schleider*, 124 S.W.3d 640, 650, n.4 (Tex. App.—Houston [14th Dist.] 2003, pet. denied).

S.W.3d at 55; *Hirschfeld Steel Co. v. Kellogg Brown & Root, Inc.,* 201 S.W.3d 272, 283–86 (Tex. App.—Houston [14th Dist.] 2006, no. pet.). Even if the jury did not base its damage finding upon either the out-of-pocket measure of damages or the benefit-of-the-bargain measure of damages, this would not make the evidence legally or factually insufficient. *See Equistar Chemicals, L.P.*, 240 S.W.3d at 868; *Osterberg*, 12 S.W.3d at 55; *Hirschfeld Steel Co.,* 201 S.W.3d at 283–86. Accordingly, we overrule the twenty-seventh issue.

**E.      Is the evidence legally and factually sufficient to support the jury's finding that Art committed statutory fraud against Jim?**

In their second issue, the EMS Parties assert that the evidence is legally insufficient to support the jury's determination in response to Question 9b that Art committed statutory fraud against Jim. In his testimony, Jim focused on the conduct of Tim. Jim did not testify that Art engaged in conduct similar to that of Tim. On appeal, the Sandts have not cited evidence that is legally sufficient to support the jury's finding that Art committed statutory fraud. Under the applicable standard of review, we conclude that the evidence is legally insufficient to support the jury's finding in answer to Question 9b that Art committed statutory fraud. Therefore, the trial court erred to the extent it rendered judgment based upon this jury finding.

We must determine whether this error was harmful, that is, whether this error probably caused the rendition of an improper judgment.[10] *See* Tex. R. App. P. 44.1(a). If the jury's finding in response to Question 9b were the only finding that supports Art's liability for statutory fraud, then this error would be harmful. But, we conclude that trial court also based its judgment on the jury's findings in response to Question 17, that Tim, Art, Harvey, and Energy Maintenance were all part of a conspiracy that damaged Jim.

The concept of civil conspiracy is sometimes used by a plaintiff as a basis for establishing joint and several liability among several defendants, some of whom may not

---

[10] This error did not probably prevent Art from properly presenting the case to this court. *See* Tex. R. App. P. 44.1(a)(2).

have committed a tort by their own conduct. *See Carroll v. Timmers Chevrolet, Inc.*, 592 S.W.2d 922, 925 (Tex. 1979); *Greenberg Traurig of New York, P.C. v. Moody*, 161 S.W.3d 56, 90 (Tex. App.—Houston [14th Dist.] 2004, no pet.). If a plaintiff proves a civil conspiracy, then each conspirator is responsible for all acts done by any of the conspirators in furtherance of the conspiracy. *See Carroll*, 592 S.W.2d at 925; *Greenberg Traurig of New York, P.C.*, 161 S.W.3d at 90. A finding of civil conspiracy imposes joint and several liability on all conspirators for actual damages resulting from acts in furtherance of the conspiracy. *See Carroll*, 592 S.W.2d at 925–26; *Greenberg Traurig of New York, P.C.*, 161 S.W.3d at 90.

In the jury charge, the trial court submitted conspiracy as a means of imposing joint and several liability on the EMS Parties; the trial court did not submit conspiracy as a separate claim.[11] The trial court did not ask the jury to determine the damages to the Sandts, if any, that resulted from the conspiracy. The trial court conditioned Question 17 on four different tort findings. Because of the structure of the jury charge and the way in which the jury answered the questions, the jury answered Question 17 based upon its findings of liability as to statutory fraud and common law fraud. Therefore, if the evidence supports a finding that Tim committed statutory fraud or common law fraud, the jury's conspiracy findings in response to Question 17 are a basis for holding all of the EMS Parties liable for the actual damages caused by Tim's fraud, even if the other defendants did not commit fraud themselves. *See Carroll*, 592 S.W.2d at 925–26; *Greenberg Traurig of New York, P.C.*, 161 S.W.3d at 90. The jury's finding in response to Question 9b supports a statutory-fraud judgment against Art based upon Art's commission of statutory fraud by his own conduct. The jury's finding in response to Question 17 supports a statutory-fraud judgment against Art based upon Art's participation in a conspiracy and the commission of statutory fraud by one of the other conspirators, such as Tim. The judgment states that "the Sandts elect recovery under statutory fraud." We conclude that,

---

[11] This question was based upon PJC 109.1. *See* State Bar of Texas, Texas Pattern Jury Charges—Business, Consumer, Insurance & Employment PJC 109.1 (2008).

by electing to recover judgment based upon their statutory-fraud claims, the Sandts elected to recover judgment based upon all jury findings that support liability for statutory fraud. These findings include the jury's findings in response to Question 17.[12]

In their opening brief, the EMS Parties do not assign error or present any argument challenging the legal or factual sufficiency of the evidence regarding the jury's findings in response to Question 17. In their reply brief, the EMS Parties concede that they did not challenge the conspiracy findings in their opening brief.[13] Because the EMS Parties did not challenge these findings in their opening brief, we must give effect to the findings.[14]

---

[12] If, contrary to our construction, the judgment is not based on the conspiracy findings under the language in the judgment, then the judgment would be silent on this issue. In that case, this court would have to look at the damages awarded in the judgment to determine which findings were the basis for the judgment. *See Gulf States Utilities Co. v. Low*, 79 S.W.3d 561, 564–65 (Tex. 2002); *Hatfield,* 316 S.W.3d at 59–60. The trial court rendered judgment for actual damages and attorney's fees against Harvey, and the only possible basis for this judgment is the conspiracy finding, under which Harvey is jointly and severally liable with his fellow conspirators for the statutory-fraud that the other conspirators committed. The trial court based its judgment upon statutory fraud, and the jury's finding that Art was part of the conspiracy is a basis for statutory-fraud liability against Art. *See Carroll*, 592 S.W.2d at 925–26; *Greenberg Traurig of New York, P.C.*, 161 S.W.3d at 90. If the judgment were determined to be silent, we still would conclude that the jury's findings in response to Question 17 are a basis for the judgment against Art. *See Gulf States Utilities Co.*, 79 S.W.3d at 564–65; *Hatfield*, 316 S.W.3d at 59–60.

[13] In their reply brief, the EMS Parties challenge the legal and factual sufficiency of the evidence regarding this question, but only in response to briefing in the Sandts' brief regarding conditional *Boyce Iron Works* elections by the Sandts. *See Boyce Iron Works, Inc.*, 747 S.W.2d at 787 ("When the jury returns favorable findings on two or more alternative theories, the prevailing party need not formally waive the alternative findings. That party may seek recovery under an alternative theory if the judgment is reversed on appeal."); *Hatfield*, 316 S.W.3d at 60 n.3 (stating that *Boyce Iron Works* election of alternative theory of recovery may be addressed on original submission if briefed by the parties).

[14] Even if Art had challenged the finding that he was part of the conspiracy, we would conclude that the evidence is legally and factually sufficient to support this finding. Art and Tim were the only members of Energy Maintenance's Board of Directors. Both as director and member, Art signed documents regarding the amendment of the LLC Agreement. There was evidence supporting a reasonable inference that Art was aware the proposed amendments were not submitted to Jim, even though the LLC Agreement required proposed amendments to be submitted to all members and even though Jim was a member of Energy Maintenance. Less than two weeks after the amendments were approved without Jim's knowledge, Art hosted a holiday party that the Sandts attended. Art and the other Energy Maintenance members did not tell the Sandts about the meeting regarding the proposed amendments to the LLC Agreement or the approval of the amendments.

22

*See Howeth Investments, Inc. v. City of Hedwig Village*, 259 S.W.3d 877, 890–91 & n.13 (Tex. App.—Houston [1st Dist.] 2008, pet. denied).

Though the evidence is legally insufficient to support the jury's finding that Art committed statutory fraud by his own conduct, the unchallenged conspiracy findings predicated on the statutory-fraud finding against Tim provide a basis for holding Art liable for statutory fraud.[15] *See Carroll*, 592 S.W.2d at 925–26; *Greenberg Traurig of New York, P.C.*, 161 S.W.3d at 80–90; *Murphy v. American Rice, Inc.*, No. 01-03-01357-CV, 2007 WL 766016, at *16–17 (Tex. App.—Houston [1st Dist.] Mar. 9, 2007, no pet.) (mem. op.). This court already has overruled all issues challenging the trial court's judgment against Tim based upon statutory fraud. Under the jury's conspiracy findings, predicated upon liability findings for statutory fraud, Art is jointly and severally liable with Tim as to the entire judgment against Tim, except as to exemplary damages.[16]

Regarding exemplary damages, the conspiracy findings do not make Art vicariously liable for the exemplary damages that the jury assessed against Tim. *See* Tex Civ. Prac. & Rem. Code Ann. § 41.006 (West 2011) ("In any action in which there are two or more defendants, an award of exemplary damages must be specific as to a defendant, and each defendant is liable only for the amount of the award made against that defendant."). The Supreme Court of Texas, in *Akin v. Dahl*, indicated that, if the predicate conduct for the assessment of exemplary damages is included in the essential elements of a claim and if one conspirator has been found liable as to that claim, a finding of the predicate for exemplary damages is not necessary as to the other conspirator. *See Akin v. Dahl*, 661 S.W.2d 917, 921–22 (Tex. 1983). But, the essential elements for statutory fraud do not

---

[15] The EMS Parties assert that the jury's conspiracy findings are immaterial because Question 17 should have been tied to either the finding of actual damages or the punitive damages findings. But, the Supreme Court of Texas has concluded that any failure to properly condition or connect a conspiracy question with the rest of the charge is a defect that is waived by failure to object at the charge conference. *See Chu v. Hong*, 249 S.W.3d 441, 444 (Tex. 2008). No party objected to any alleged defect in Question 17; thus any such defect was waived, and the jury's answers to this question are not immaterial. *See id*.

[16] In the jury charge, the trial court refers to these damages as "exemplary damages," while in the judgment, the trial court uses the term "punitive damages." We use the term "exemplary damages" in this opinion.

23

satisfy the prerequisite for assessing exemplary damages. *See* Tex Bus. & Comm. Code Ann. § 27.01 (West 2011). Therefore, the *Akin* case is not on point. *See Akin*, 661 S.W.2d at 921–22. In addition, in the jury charge, the trial court instructed the jury to base its assessment of exemplary damages against Art on his conduct in committing statutory or common-law fraud, not upon his conduct in conspiring to commit these torts. On this record, the legal insufficiency of the jury's finding that Art committed statutory fraud removes the only proper basis for awarding exemplary damages against Art under the statutory-fraud claim.[17] For this reason, the trial court's error in rendering judgment based upon the jury finding in response to Question 9b is harmful to the extent that the trial court awarded exemplary damages against Art. Accordingly, we sustain the second issue and modify the trial court's judgment to delete the award of exemplary damages against Art.[18]

**F.      Is there a basis for this court to reverse the judgment against Harvey and in favor of Jim?**

In none of the EMS Parties' twenty-seven issues do they challenge the trial court's judgment against Harvey or the conspiracy findings that were the main basis for Harvey's liability. The EMS Parties briefly argue that the record contains no evidence that Harvey made any false representation or promise to Jim, but this argument relates to the EMS Parties' issue challenging the finding that Energy Maintenance committed statutory fraud. We presume, without deciding, that, under a liberal construction of the EMS Parties' brief,

---

[17] In a conditional cross-point, Jim requests judgment based upon other theories of recovery if this court concludes that the judgment cannot be affirmed based upon the statutory-fraud theory of recovery. This court concludes that after deleting the award of exemplary damages against Art, the judgment against Art can be affirmed, as modified, based upon the statutory-fraud theory. Because the attorney's fees award under this theory is greater than the exemplary damage award against Art, even with the deletion of the exemplary-damage award, the statutory fraud theory provides Jim the greatest relief against Art. We conclude that the conditional cross-point has not been triggered as to Jim's claims against Art. Because Jim has not made or briefed a *Boyce Iron Works* election of alternative recovery against Art under these circumstances, we do not address such an election. *See Hatfield*, 316 S.W.3d at 60 n.3; *Beal Bank, S.S.B.*, 124 S.W.3d at 650, n.4.

[18] Therefore, we need not address the eighth, fourteenth, and twentieth issues regarding actual awareness and factual sufficiency.

they have assigned error and presented argument that this court should reverse the judgment against Harvey because there is legally insufficient evidence that Harvey made a false representation or false promise to Jim. Even if the evidence were legally insufficient in this regard, as discussed above, the EMS Parties did not challenge the conspiracy findings in response to Question 17 in their opening brief. Because these conspiracy findings provide a basis for the trial court's judgment against Harvey under the statutory-fraud theory and because the trial court did not award exemplary damages against Harvey, this court would affirm the judgment against Harvey even if there were legally insufficient evidence that he made a false representation or false promise.[19] *See Carroll*, 592 S.W.2d at 925–26; *Greenberg Traurig of New York, P.C.*, 161 S.W.3d at 80–90; *Murphy*, 2007 WL 766016, at \*16–17.[20]

## V. CONCLUSION

The evidence is legally and factually sufficient to support the jury's findings that Tim and Energy Maintenance committed statutory fraud against Jim with actual awareness of the falsity of the representation or promise. Under the unobjected-to damages question submitted to the jury, even if the jury did not base its damages finding upon either the out-of-pocket measure of damages or the benefit-of-the-bargain measure of damages, the evidence of damages would not be legally or factually insufficient. We presume that the EMS Parties have assigned error and argued that this court should reverse the judgment against Harvey because the evidence is legally insufficient to prove that Harvey made a false representation or false promise to Jim. Even under this presumption, the

[19] Even if Harvey had challenged the conspiracy findings, we still would conclude that the evidence is legally and factually sufficient to support these findings.

[20] In their twenty-fifth issue, the EMS Parties assert that the evidence is legally and factually insufficient to support the jury's finding that Tim and Art entered into an oral agreement with the Sandts. The trial court's judgment was not based upon the Sandts' oral-contract theory of recovery. Therefore, we need not and do not address the twenty-fifth issue. In their twenty-sixth issue, the EMS Parties assert that, if this court sustains one or more of the first twenty-five issues, then the jury's findings as to damages, vice principal, exemplary damages, and attorney's fees are immaterial. The issues that we have sustained have not made these findings immaterial. Accordingly, we overrule the twenty-sixth issue.

unchallenged conspiracy findings predicated on the statutory-fraud finding against Tim provide a basis for the trial court's judgment against Harvey.

Even presuming that the money Jim invested in Energy Maintenance was community property, on this record, the evidence is legally insufficient to support a finding that Tim, Art, or Energy Maintenance committed statutory fraud against Roxanne. Though the evidence is legally insufficient to support the jury's finding that Art committed statutory fraud by his own conduct, the unchallenged conspiracy findings predicated on the statutory-fraud finding against Tim provide a basis for the judgment against Art in all respects except as to exemplary damages. Accordingly, we modify the trial court's judgment to delete the award of exemplary damages against Art and to delete any recovery by Roxanne.[21]

The trial court's judgment, as modified, is affirmed.


/s/     Kem Thompson Frost
        Justice



Panel consists of Justices Frost, Brown, and Christopher.

---

[21] We conclude that our disposition of the EMS Parties' issues has not triggered the Sandts' conditional cross point.   Therefore, we do not address this cross point or the EMS Parties' briefing in the reply brief in response to this cross point.