**Affirmed and Memorandum Opinion filed August 29, 2013.**



In The

# Fourteenth Court of Appeals

### NO. 14-12-00610-CV

### RICHARD C. FORD, Appellant

### V.

### PREMIER INSTALLATION & DESIGN GROUP, INC. AND MORRIS E. SANFORD, III, Appellees

**On Appeal from the 295th District Court**
**Harris County, Texas**
**Trial Court Cause No. 2008-66755**

## M E M O R A N D U M   O P I N I O N

In this breach-of-contract case, a property owner challenges the sufficiency of the evidence to support several jury findings. The property owner also asserts that the trial court abused its discretion in an evidentiary ruling. We affirm.

### I. FACTUAL AND PROCEDURAL BACKGROUND

**A.      The Lease**

Appellant Richard C. Ford owned property at 21610 Hempstead Highway in Cypress, including Tracts E, F, G, and H, as well as Tract 139, located directly

behind Tract F.  Ford also owned property located at Huffmeister and Highway 290 (the "Huffmeister Property").  Communication from appellee Morris E. Sanford, III, to Ford, dated November 7, 2005, indicates that appellee Premier Installation & Design Group, Inc. was considering the possibility of leasing both properties, with the lease of the Huffmiester Property to occur sometime in the future.  Later that month, Ford and Premier entered into a five-year commercial lease agreement for Tracts E, F, G, and H at the Hempstead Highway location (the "Leased Property").  A fenced portion on the western edge of Tract H serving as "the driveway to Tract 139" was not part of the Leased Property.  Sanford, Premier's president, executed both the lease and a personal guaranty of the lease.  The rent under the lease was $3,500.00 per month for the first three years, $3,750 per month for the fourth year, and $3,937.50 per month for the fifth year.  Rent was due on the 15th of each month, with a ten-day grace period.

According to the lease, Premier planned to use the Leased Property to construct permanent displays for its landscaping and hardscaping design services and to conduct retail sales on the property.  Premier agreed to keep the office building located on the Leased Property in good repair.  But, the lease provided that if the office building were removed from the Leased Property due to pending court action or Ford electing to use it elsewhere and Ford chose not to replace it, Premier was entitled to a $500 reduction in rent per month.

The following provisions of the lease are also pertinent to this dispute:

- The lease explicitly provided that time was of the essence.
- Premier was required to pay property taxes on the Leased Property upon Ford's submission of the property tax statements to Premier.[1]

---

[1] The lease specified that Premier was only responsible for property taxes on Tracts E, F, G, and H.

2

- Premier was granted a first option to rent or buy Tract 139 when Ford decided to lease or sell the property.

- Any amendments to the lease were required to be in writing and executed by all parties.

- Two "piles of gravel already located on the property" were to be used by Ford on the entrance drive to Tract 139.

- Ford was required to remove the gravel piles and granite from the Leased Property within 90 days of signing the lease agreement.

## B.    Events Leading up to the Dispute

In December 2006, Sanford, on behalf of Premier, notified Ford in writing that, after completing three months of "due diligence" on the Huffmeister Property,[2] he had decided that Premier would concentrate on the design and build of the Leased Property, rather than further consider leasing the Huffmeister Property. In this letter, Sanford stated he would like to discuss leasing the "little trailer" at the back of the Leased Property or the possible exchange of trailers when Ford was "ready to move the trailer" from the Huffmeister Property. He further expressed a desire to meet with Ford before the end of the year or speak with him as soon as possible in January.

It is undisputed that Ford never removed the gravel piles and granite from the Leased Property. It is further undisputed that at least one attempt to sublet the Leased Property failed. On October 14, 2008, Sanford, on behalf of Premier, notified Ford in writing that Ford had "constructively evicted" Premier from the Leased Property and that Premier was terminating the lease for the following reasons, among others:

- The granite was not moved from the Leased Property within 90 days of the inception of the lease. Although Sanford did not "demand"

---

[2] This letter indicates that Premier paid Ford $3,000 per month for the period of October 2006 through December 2006 to complete the "due diligence" on this property.

removal of the granite pursuant to the lease provision, both he and his wife had "politely" reminded Ford "on many occasions" that they needed him to remove the granite because Premier needed the stabilized area where the granite was stored to build a display center and other improvements. Because the granite continued to obstruct the stabilized area on the Leased Property, Premier had been unable to construct its display center during its "down time."

- Ford neither notified Premier when he removed the original office/trailer from the Leased Property nor delivered the promised replacement office/trailer. Premier was entitled to a $500/month credit for the period that the office/trailer was removed and not replaced.

- Because of Ford's failure to remove the granite over a two-year period and the problem with the office/trailer, Premier determined its resources would be better used elsewhere; Sanford decided to sublease the property, with Ford's permission. Sanford contacted Ford regarding subleasing the property, and Ford insisted that Ford fully control the sublease process, including interviewing potential sub-lessees. Ford refused to permit Sanford/Premier to display their phone number on a "for lease" sign and instead erected his own sign. After eighteen months, Ford told Sanford he had "turned away many callers." In 2008, Ford "had a company with sincere interest," but this company "found dealing with [Ford] too complicated and moved on."

- Ford demanded that Premier pay for fencing, pay for repair of the front gates that were damaged due to Ford's activities on the Leased Property, and forfeit the $500/month reduction in rent due to Premier for Ford's removal of the trailer before Ford would permit Premier to sublet the Leased Property.

- Ford had caused Premier "unreasonable hardship and loss-of-use" of the Leased Property and had "breached the lease agreement with numerous offenses and obstructions." His "actions ha[d] led to the property being untenable and ha[d] prevented Premier from subleasing the Property."

- Premier had attempted to remove six to seven pallets of pavestone located on the property and discovered that Ford had changed the lock on the front gates, resulting in Premier being locked out of the property and being unable to access its property, worth over $1,000.00. As of the date of the letter, Premier had received no

written notification from Ford of his intent to lock Premier out or take possession of its property pursuant to the lease. According to the terms of the lease, Ford should have taken no action to lock Premier out of the property or confiscate its property before October 15, 2008.

Premier sought access to the property to remove its pavestones, return of its $3,937.50 security deposit, and reimbursement of $7,000.00—$500 for each month that the trailer/office was not provided on the Leased Property.

Ford responded in a letter dated November 4, 2008, with the caption "Final Notice Before Legal Action," also designated as "2nd Notice."[3] This letter indicated it was sent by fax on November 5 and by registered mail on November 6. In this correspondence, Ford stated:

> Mr. Sanford, your letter that you sent on 10-14-08 by FedEx., shows me that you have no intent to honor your lease, repair damages to your fence, or damages to your office after Hurricane Ike. Mr. Sanford you have not maintained the property, office, fence, or paid the 2007 taxes after numerous conversations and faxes to you. Mr. Sanford you are presently two months behind in rent. Mr. Sanford you have been given ample time to cure this problem and you refuse to do the right thing. The attorney that I gave you on the first notice back in late September will handle this case in District Court. . . .

## C.    The Lawsuit

A few days later, Ford filed suit against Premier and Sanford (hereinafter, the "Premier Parties") asserting a claim for breach of contract.[4] The Premier Parties answered and later filed a counterclaim. In their counterclaim, the Premier Parties asserted claims for breach of contract, conversion, unlawful lockout, constructive eviction, and unlawful retention of Premier's security deposit.

---

[3] There is no "1st Notice" in our record.

[4] Ford amended his petition to include more facts but still asserted the same claim.

The claims were tried to a jury. On appeal, Ford challenges the legal and factual sufficiency of the evidence to support the following jury findings:

- Ford failed to comply with the terms of the lease;
- Ford's failure to comply with the lease was not excused;
- the sum of $73,500, if paid now in cash, would fairly and reasonably compensate Premier for its damages that resulted from Ford's failure to comply with the lease;
- Ford failed to timely refund Premier's security deposit;
- Ford unlawfully locked Premier out of the property;
- Ford converted Premier's property; and
- Premier did not fail to comply with the lease.

Ford, Sanford, and Tammy Sanford, Sanford's wife, offered conflicting testimony regarding the removal of the granite and gravel. Ford testified that there were 118 slabs of granite on the Leased Property and two piles of gravel. Ford admitted that the reason the granite-removal clause was added to the lease was because Sanford wanted it in there "from the getgo" during the lease negotiations. Ford explained that he did not remove the granite or gravel because he was never asked to do so and because Sanford indicated to him that Sanford planned to use some of the granite in building Premier's displays. According to Ford, there was "no doubt" in his mind that he and Sanford had an agreement to keep the granite and gravel on the property past the ninety-day period provided in the lease.

The Sanfords, on the other hand, testified that they repeatedly asked Ford to remove the granite from the Leased Property because they could not build Premier's permanent displays with the granite on the property. Sanford denied that he had any discussions with Ford about keeping the granite on the property past the ninety-day deadline in the lease. He stated Premier had "no use" for the granite in its displays. Both Sanford and Tammy testified about the December 20, 2006

6

letter, from Premier to Ford stating that Premier intended to "concentrate on the Design & Build of the [Leased Property] in 2007" and "concentrate on the [Leased Property] and to make the size of that location work for us in 2007" explaining that the letter was preceded by numerous conversations with Ford regarding Premier's need for Ford to remove the granite from the Leased Property. According to Sanford, this letter meant that Ford needed to "[g]et [his] granite off [Premier's] property."

Sanford testified that Premier continued paying rent despite Ford's failure to remove the granite and gravel during the ninety-day term specified by the lease because Ford offered multiple excuses for not removing the material. According to Sanford, Ford stated repeatedly he would "get to it" after he did something else. Sanford further testified that the main reason he had been interested in leasing this particular property for Premier was because of the presence of the large concrete pad. Sanford explained that having the concrete pad on the property saved him considerable money—he stated it would have cost up to $90,000 to have a similar concrete pad installed on another property. Sanford testified that Ford's repeated excuses for not removing the granite and gravel led Premier to seek to sublease the property about two years into the lease, which took more time, while Premier continued to pay rent. Finally, Sanford stated that Premier continued to pay rent because Ford threatened to sue Premier several times; according to Sanford, he was hoping to avoid a lawsuit and hoping that Ford eventually would move the granite if Premier kept paying rent. Sanford reiterated that the cost of creating a concrete pad on another property also contributed to his decision to continue paying rent.

The parties also offered conflicting testimony regarding payment of the 2007 and 2008 property taxes. Ford testified that he sent the tax receipts for these two years to Premier to be paid. But, Ford admitted that he never provided a receipt to

Premier that he had paid the 2008 taxes. Both Sanford and his wife testified that Premier did not receive receipts or notices from Ford that the 2007 or 2008 taxes were due and owing. Ford testified that Premier paid rent on August 15, 2008, and did not pay any more rent after that time. Sanford and his wife agreed that the August 15 rental payment was the last payment Premier made, but asserted that Premier stopped paying rent because Ford illegally locked Premier out of the Leased Property before the next rent payment became due.

Ford stated that Sanford placed several pallets of "paver stones" on the Leased Property about a month before he received the October 14, 2008 letter, described above, and entered into evidence at trial. He testified that he did not know who changed the front lock and that the key he had, which he received from Sanford, did not work. Ford further testified that Sanford had access to the Leased Property through a gate in the back of the Leased Property through Tract 139. According to Ford, Sanford also could have cut the chain on the front gate to access the Leased Property. Ford stated that he believed Sanford had the lock changed so that he could "get out of the lease." Finally, Ford testified he did not remember having a "heated" telephone conversation with Sanford.

Sanford testified that, on September 30, 2008, he had a "heated discussion" with Ford regarding several issues with the lease. He stated that, during this conversation, he blamed Ford for the failure of a sublease opportunity and he informed Ford that, moving forward, he expected Ford to abide by the terms of the lease. According to Sanford, he informed Ford that, because Ford had removed the trailer from the Leased Property, Premier was entitled to a $500 per month reduction in rent under to the lease. Sanford also testified that he told Ford that he "must absolutely remove the granite immediately." Sanford stated that Ford would not reduce the rent, that Ford insisted Sanford must erect a fence and fix the front

8

gates,[5] and that Sanford would be "responsible" for Tract 139. Sanford explained that he told Ford he would need to speak with his attorney. According to Sanford, Ford then "cussed" him out and stated, "This is not going to go the way you want in court. It's not my first rodeo. I've done this before. You don't know what you're getting into." Tammy Sanford's notes, taken while this conversation was occurring on a speakerphone, were redacted and admitted into evidence.

Sanford stated that, after this conversation he became concerned about his access to the Leased Property and to the six or seven pallets of paver stones that he had stored on the property within the first ninety days of the lease. He testified that he sent an employee out to the Leased Property, but the employee was unable to access the property and informed Sanford that the lock to the gate had been changed. Sanford explained that he went out to the Leased Property shortly thereafter and was also unable to access the property; he testified that he tried using all his keys and none of them worked to open the lock. According to Sanford, it was not a "coincidence" that the lock was changed after his September 30 "heated" conversation with Ford. Sanford testified that he "absolutely" believes that Ford changed the lock and intended to lock him out of the Leased Property.

There were no objections by any party to the trial court's jury charge.[6] After hearing all the evidence, the jury rendered its verdict. The jury found that (1) the sum of $73,500 would fairly and reasonably compensate Premier for its damages that resulted from Ford's failure to comply with the lease; (2) the sum of $1,000 would fairly and reasonably compensate Premier for its damages resulting from

---

[5] The front gates had been damaged several months into the lease when thieves rammed them in to access the property and steal a trailer that Ford had left on the property over the weekend.

[6] Ford did submit a proposed charge to the trial court in writing; however, Ford did not object to the court's charge or tender any proposed questions, instructions, or definitions during the charge conference.

9

Ford's conversion of Premier's property; and (3) Ford wrongfully withheld the entire amount of Premier's $3,937.50 security deposit. The trial court rendered judgment on the jury's verdict, awarding Premier $89,912.50 in damages,[7] plus prejudgment and postjudgment interest, as well as attorney's fees for trial and contingent appellate attorney's fees. This appeal timely followed.

## II. ISSUES AND ANALYSIS

### A. Sufficiency of the Evidence

When reviewing the legal sufficiency of the evidence, we consider the evidence in the light most favorable to the challenged finding and indulge every reasonable inference that would support it. *City of Keller v. Wilson,* 168 S.W.3d 802, 823 (Tex. 2005). We must credit favorable evidence if a reasonable factfinder could and disregard contrary evidence unless a reasonable factfinder could not. *See id.* at 827. We must determine whether the evidence at trial would enable reasonable and fair-minded people to find the facts at issue. *See id.* The factfinder is the only judge of witness credibility and the weight to give to testimony. *See id.* at 819. When a party attacks the legal sufficiency of an adverse finding on an issue on which he bears the burden of proof, he must demonstrate on appeal that the evidence establishes, as a matter of law, all vital facts in support of the issue; the evidence is legally insufficient only if the contrary proposition is conclusively established. *Dow Chem. Co. v. Francis*, 46 S.W.3d 237, 241 (Tex. 2001) (per curiam).

When reviewing a challenge to the factual sufficiency of the evidence, we examine the entire record, considering both the evidence in favor of, and contrary

---

[7] This amount includes $3,500 in statutory damages for unlawful lockout under Texas Property Code section 93.002(g)(2) and statutory damages of $11,812.50 for unlawful retention of Premier's $3,937.50 security deposit under Texas Property Code section 93.001(a).

to, the challenged finding. *Maritime Overseas Corp. v. Ellis*, 971 S.W.2d 402, 406–07 (Tex. 1998). After considering and weighing all the evidence, we set aside the fact finding only if it is so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust. *Id.* The trier of fact is the sole judge of the credibility of the witnesses and the weight to be given to their testimony. *GTE Mobilnet of S. Tex. v. Pascouet*, 61 S.W.3d 599, 615–16 (Tex. App.—Houston [14th Dist.] 2001, pet. denied). We may not substitute our own judgment for that of the trier of fact, even if we would reach a different answer on the evidence. *Maritime Overseas Corp.*, 971 S.W.2d at 407. The amount of evidence necessary to affirm a judgment is far less than that necessary to reverse a judgment. *Pascouet*, 61 S.W.3d at 616.

**1.  Is the evidence legally and factually sufficient to support the jury's finding that Ford's failure to comply with the lease was not excused by waiver, equitable estoppel, or "oral modification"?[8]**

In his second issue, Ford challenges the evidence supporting the jury's answer to Question 9, which Ford asserts asked whether his failure to comply with the lease was excused by waiver, estoppel, oral modification, or novation.[9] The jury answered "No" to this question. Ford had the burden of proving these affirmative defenses.

**(a).  Waiver**

The charge defined waiver as "an intentional surrender of a known right or intentional conduct inconsistent with claiming the right." Ford asserts that Premier's continued performance under the lease and its failure to bring suit

---

[8] Ford also includes "novation" in his issue presented, but makes no argument in support of this part of the issue, so we will not address the novation defense in our analysis.

[9] This question asks whether Ford's failure to comply with the lease was excused. It was predicated on an affirmative answer to Question 2, which asked whether Ford failed to comply with the terms of the lease.

establishes that Premier was acting inconsistently with its known right to have the granite and gravel removed.[10]

Ford states in his brief that Premier's objections to Ford's failure to remove the granite and gravel "is certainly *evidence* that waiver did not take place." Ford further concedes that "there was no express relinquishment of a known right" by Premier. Because he bore the burden of proof to establish this defense and the jury found against him, he has acknowledged that there is legally sufficient evidence to support the jury's finding. *See Dow Chem. Co.*, 46 S.W.3d at 241–42.

Further, as discussed, *supra*, the testimony of the Sanfords conflicts with Ford's testimony regarding the removal of the granite and gravel. The jury is the sole judge of the credibility of the witnesses and the weight to be given to their testimony. *GTE Mobilnet of S. Tex.*, 61 S.W.3d at 615–16. As noted above, the Sanfords testified that they repeatedly requested that Ford remove the granite and gravel from the property, although Ford testified that they never asked him to remove it. Sanford stated that Ford continually promised to remove the granite and gravel, but that Ford always had an excuse as to why he could not remove it immediately.

Further, both Sanford and his wife testified in detail about their reasoning behind continuing to pay Premier's lease payments: Sanford explained that Premier's business was "cyclical," and that generally, its downtime was during the late winter months. Thus, Premier was only able to construct its display center during certain periods of the year. That is why Sanford had insisted that the

---

[10] Ford also asserts that Premier waived its right to complain about Ford's failure to credit Premier $500 per month for the time period during which he elected not to replace the office/trailer he removed from the Leased Property. But, the jury's finding of breach, on which this question is premised, was not based on Ford's failure to credit Premier for this amount and the jury did not award Premier any damages based upon this particular breach of the lease.

ninety-day clause for removal of the granite and gravel be put into the lease and why Premier had sent the December 2006 letter to Ford emphasizing that Premier planned to "concentrate" on building its display center on the Leased Property in 2007. Sanford further explained the considerable expense involved in constructing a concrete pad similar to that which already stood on the Leased Property.

Finally, both Sanford and his wife detailed their difficulties in working with Ford and stated that, had they demanded that Ford remove the granite and gravel, rather than continued to try to work with him, Ford would have sued them sooner. Although Ford testified that he and Sanford orally agreed that the granite and gravel could remain on the property, the jury was free to disbelieve Ford and believe the Sanfords' testimony. *See id.* When viewed in context, the Sanfords' and Tammy's actions may be construed as good-faith efforts to get Ford to perform under the contract, rather than a waiver of any claim of breach. *See Cal-Tex Lumber Co. v. Owens Handle Co.*, 989 S.W.2d 802, 813 (Tex. App.—Tyler 1999, no pet.).

Ford advances the "voluntary-payment" defense in his brief. Under the common-law voluntary-payment rule, money voluntarily paid on a claim of right, with full knowledge of all the facts, in the absence of fraud, deception, duress, or compulsion, cannot be recovered merely because the party at the time of payment was ignorant of or mistook the law as to his liability. *BMG Direct Mktg., Inc. v. Peake*, 178 S.W.3d 763, 768 (Tex. 2005). This rule is a defense to claims asserting unjust enrichment; that is, when a plaintiff sues for restitution claiming a payment constitutes unjust enrichment, a defendant may respond with the voluntary-payment rule as a defense. *Id.* The Premier Parties did not assert an equitable claim for unjust enrichment. Additionally, Ford did not assert the voluntary-payment rule as a defense to any of the Premier Party's claims. Notwithstanding

the foregoing, the evidence is legally and factually sufficient to support a failure to find the voluntary-payment defense. *See R.G. McClung Cotton Co. v. Cotton Concentration Co.*, 479 S.W.2d 733, 743–744 (Tex. Civ. App.—Dallas 1972, writ ref'd n.r.e.). Ford also asserts an "election" defense for the first time on appeal. The record reflects that he never asserted this defense before the trial court. Accordingly, he has not preserved this issue for our review, and we do not consider it.

Under the applicable standards of review, we conclude that the evidence is legally and factually sufficient to support the jury's failure to find waiver in its response to Question 9.

### (b). Equitable Estoppel

The jury charge provided that Ford was excused from complying with the lease if:

1. Premier Installation
    a. by words or conduct made a false representation or concealed material facts, and
    b. with knowledge of the facts or with knowledge or information that would lead a reasonable person to discover the facts, and
    c. with the intention that Richard C. Ford would rely on the false representation or concealment in acting or deciding not to act; and
2. Richard C. Ford
    a. did not know and had no means of knowing the real facts, and
    b. relied to his detriment on the false representation or concealment of material facts.

14

This definition pertains to Ford's affirmative defense of equitable estoppel. *See Johnson & Higgins of Tex., Inc. v. Kenneco Energy, Inc.*, 962 S.W.2d 507, 515–16 (Tex. 1998) (defining elements of equitable estoppel).

There is simply no evidence that Premier falsely represented or concealed any material facts about which it had knowledge but Ford did not. Instead, when viewed in the light most favorable to the jury's finding, the record evidence reflects that Ford knew the lease required him to remove the granite and gravel from the Leased Property within ninety days of the execution of the lease; that, after this deadline, the Sanfords repeatedly requested that Ford remove the granite and gravel; and that Ford repeatedly promised he would remove the granite and gravel from the Leased Property but never did. The jury is the sole judge of the credibility of the witnesses and the weight to be given to their testimony. *GTE Mobilnet of S. Tex.*, 61 S.W.3d at 615–16. Under the applicable standards of review, we conclude that the evidence is legally and factually sufficient to support the jury's failure to find equitable estoppel in its response to Question 9.

### (c). "Oral Modification"

Ford asserts that another affirmative defense submitted to the jury in Question 9 was whether he was excused from performance because the contract was "orally modified." Although we do not perceive this question to have been asked of the jury, we presume Ford is referring to the following definition provided to the jury: "Failure to comply by Richard C. Ford is excused if a different performance was accepted as full satisfaction of the original obligations of the Lease."

Ford claims he entered into an oral agreement with Premier, which allowed the granite and gravel to remain on the Leased Property. But, both of the Sanfords testified that they never agreed to allow Ford to keep the granite and gravel on the

15

Leased Property after the ninety-day deadline had expired. The jury was free to believe this testimony and disbelieve Ford's testimony. *See GTE Mobilnet of S. Tex.*, 61 S.W.3d at 615–16. Under the applicable standards of review, we conclude that the evidence is legally and factually sufficient to support the jury's failure to find this defense in its response to Question 9.

In sum, as to the three defenses challenged under Ford's second issue, the evidence is legally and factually sufficient to support the jury's failure to find these defenses in its response to Question 9. Accordingly, we overrule Ford's second issue.

**2.    Is the evidence legally and factually sufficient to support the jury's award of damages to Premier resulting from Ford's failure to comply with the lease?**

In his third issue, Ford challenges the legal and factual sufficiency of the evidence to support the jury's answer to Question 10, which asked the jury:

> What sum of money, if any, if paid now in cash, would fairly and reasonably compensate Premier Installation for its damages, if any, that resulted from Richard C. Ford's failure to comply with the Lease?
>
> Consider the following elements of damages, if any, and none other.
>
> a.    Restitution
>
> The amount of rent paid by Premier Installation to Richard C. Ford after the 90-day deadline for Richard C. Ford to remove granite and gravel from the Property.
>
> Do not include in your answer any amount that you find Premier Installation could have avoided by the instant exercise of reasonable care.
>
> Do not add any amount for interest on damages, if any.
>
> Answer in dollars and cents for damages, if any.
>
> a.    Restitution: $_____

16

The jury answered "$73,500.00."

In his argument, Ford focuses on the element of damages, *i.e.*, restitution.[11] Ford asserts that restitution damages are only available under a theory of quantum meruit. Regardless of the merits of this assertion, Ford failed to raise this argument before the trial court. Further, no party objected to this damages question or the instruction submitted to the jury by the trial court regarding this question.[12] Therefore, we determine the legal and factual sufficiency of the evidence based upon the measure of damages submitted to the jury, even if that measure of damages is not correct. *See Equistar Chems, L.P. v. Dresser-Rand Co.*, 240 S.W.3d 864, 868 (Tex. 2007) (holding that defendant failed to preserve error regarding argument that jury's damage finding was based upon improper measure of damages); *Energy Maintenance Services Group I, LLC v. Sandt*, 401 S.W.3d 204, 219 (Tex. App.—Houston [14th Dist.] 2012, pet. denied) (same as *Equistar Chems, L.P.*). Even if the jury's finding were based on an incorrect measure of damages, this would not make the evidence legally or factually insufficient to support the jury's finding in response to Question 10. Ford does not argue that the evidence is legally or factually insufficient to support this damage finding under the measure of damages submitted to the jury. Thus, Ford's third issue is without merit and is overruled.

---

[11] Ford also raises the voluntary-payment defense again in this issue, which we already have rejected above.

[12] As noted above, Ford did provide a proposed written jury charge, but Ford did not object to the court's charge or tender any proposed questions, instructions, or definitions during the charge conference.

**3.    Is the evidence legally and factually sufficient to support the jury's finding that Ford failed to timely refund Premier's security deposit?**

In Ford's fifth issue, he contends the evidence is insufficient to support the jury's affirmative answer to Question 13, which asked: "Do you find that [Ford] failed to timely refund the balance of [Premier's] security deposit?"[13] Under his third issue, the only argument that Ford advances is that the evidence is legally and factually sufficient to support a finding that Premier provided Ford with a written statement of Premier's forwarding address for the purpose of refunding the security deposit.

As noted by Ford, under the Texas Property Code, "[t]he landlord is not obligated to return a tenant's security deposit or give the tenant a written description of damages and charges until the tenant gives the landlord a written statement of the tenant's forwarding address for the purpose of refunding the security deposit." Tex. Prop. Code Ann § 93.009(a) (West 2013). But, the trial court did not instruct the jury regarding this statute; instead, the trial court instructed the jury in pertinent part as follows: "You are instructed that the balance of a security deposit must be refunded to the tenant not later than the 60th day after the date the tenant surrenders the premises and provides notice to the landlord or the landlord's agent of the tenant's forwarding address." Under the jury charge, Premier did not need to give Ford "a written statement of the tenant's forwarding address for the purpose of refunding the security deposit"; rather, Premier only had to "provide[] notice to [Ford] or [Ford's] agent of [Premier's] forwarding address." No party objected to Question 13 or the instruction submitted to the jury by the trial court regarding this question. Therefore, we determine the legal and factual

---

[13] In response to Question 14, the jury found that the amount of the security deposit that Ford wrongfully withheld was $3,937.50.

sufficiency of the evidence based upon the question submitted, even if it does not correctly state the law. *See Osterberg v Peca*, 12 S.W.3d 31, 55 (Tex. 2000); *Sandt*, 401 S.W.3d at 219. Because the jury charge did not require Premier to have provided Ford with "a written statement of the tenant's forwarding address for the purpose of refunding the security deposit," Ford's only argument under this issue lacks merit. *See Osterberg*, 12 S.W.3d at 55; *Sandt*, 401 S.W.3d at 219.

Even if Ford had argued that the evidence is legally and factually insufficient to support a finding that Premier provided notice to Ford or Ford's agent of Premier's forwarding address, as required by the charge, we would have found no merit in this argument. There is evidence that Premier sent its October 14, 2008 letter to Ford. This letter, written on Premier's letterhead, provides Premier's address and expressly requests that Ford "provide Premier the security deposit in the amount of $3,937.50." There is no other address provided in the letter. The record reflects that Ford received this letter and that, during the first week in November 2008, just before filing this suit, Ford sent a "Final Notice Before Legal Action" to Premier by certified mail at the address provided in Premier's October 14, 2008 letter.[14] We overrule Ford's fifth issue.

### 4. Is the evidence legally and factually sufficient to support the jury's finding that Ford unlawfully locked out Premier and converted its property?

In his sixth issue, Ford asserts that the evidence is legally and factually insufficient to support two of the jury's findings. First, he asserts that the jury's finding that Ford unlawfully locked Premier out of the Property is not supported by sufficient evidence. Second, he asserts that the evidence is insufficient to support the jury's finding that Ford converted Premier's property. We address each of these issues in turn.

---

[14] The cases cited by Ford involve different facts and are not on point.

### (a). Evidence of Unlawful Lockout

Jury Question 5 asked, "Did Richard C. Ford unlawfully lock Premier Installation out of the Property?" The jury was instructed that, to establish a claim for unlawful lockout, Premier had to prove that (1) there was a landlord-tenant relationship between Ford and Premier, (2) Ford intentionally locked Premier out of the Leased Property, and (3) the lockout was unlawful. In his appellate brief, Ford challenges only the second element—that he intentionally locked Premier out of the property. The trial court instructed the jury that "[a] person acts 'Intentionally' with respect to the nature of his conduct or to a result of his conduct when it is his conscious objective or desire to engage in the conduct or cause the result."

Ford points to the following testimony as showing that he did not intentionally lock out Premier:

- Ford's testimony that he did not lock the front fence or prevent Premier from entering the Leased Property;

- Premier could have cut the chain on the front gate to access the Leased Property;

- Premier changed the lock on the front gate; and that Premier could have accessed the Leased Property through a gate between Tract 139 and Tract F, which Premier could have driven through to access the Leased Property.

- Testimony of Anthony Santikos, Ford's current tenant on the Leased Property and Tract 139, that the Leased Property could be accessed through a gate on Tract 139.

Sanford, on the other hand, testified that just days after he had a heated conversation with Ford on September 30, 2008, one of his employees went to the Leased Property and discovered that the lock had been changed on the front gate. Sanford testified he went to the property shortly thereafter and was unable to

20

access it. According to Sanford, when Premier was locked out of the property, it was completely denied access. Sanford stated that there was no other entry to the property. Although Sanford admitted he did not know for sure that Ford changed the locks, he testified that "there was no doubt in his mind" that Ford changed the lock on the front gate of the Leased Property and intended to lock Premier out of the premises.

In short, the parties presented conflicting testimony on this issue. Applying the appropriate standards of review, the evidence is legally and factually sufficient to support the jury's finding in response to Question 5 that Ford intentionally locked Premier out of the Leased Property. *See Gluck v. Hadlock*, No. 02-09-00411-CV, 2011 WL 944439, at *2–3 (Tex. App.—Fort Worth Mar. 17, 2011, no pet.) (mem. op.) (concluding that legally and factually sufficient evidence supported finding that landlord intentionally locked out tenant based on conflicting evidence from parties). We overrule this portion of Ford's sixth issue.

### (b). Conversion

Question 11 concerned whether Ford converted Premier's property. The jury responded "Yes" to this question. The jury was instructed that conversion "is the unauthorized and wrongful assumption of dominion and control over the property of another to the exclusion of, or inconsistent with, the owner's rights." The jury was further instructed that, to establish that Ford converted its property, Premier had to prove that (1) it owned or had legal possession or entitlement to possession of the property, (2) Ford unlawfully and without authorization assumed and exercised dominion and control over the property to the exclusion of, or inconsistent with, Premier's rights as owner, (3) Premier demanded return of the property, and (4) Ford refused to return it. Ford has not disputed that Premier owned the pavestones.

21

It is undisputed that several pallets of these pavestones were on the Leased Property when Premier was locked out and that Premier owned these pavestones. Ford asserts, for the same reasons described above, that he did not convert Premier's pavestones because Premier could have accessed the property to retrieve them. But, again, Sanford offered conflicting testimony. Further, in Premier's October 14, 2008 letter, it demanded return of the pavestones. Finally, Ford admitted at trial that he never returned the pavestones.

Under the applicable standards of review, the evidence is legally and factually sufficient to support the jury's finding in response to Question 11 that Ford converted Premier's property. Accordingly, we overrule the remainder of Ford's sixth issue.

### 6. Is the evidence legally and factually sufficient to support the jury's finding that Premier did not fail to comply with the lease?

In issue seven, Ford asserts that the evidence is insufficient to support the jury's finding that Premier did not fail to comply with the lease. In Question 1, the jury was asked whether Premier failed to comply with the terms of the lease and responded, "No." The trial court instructed the jury that the failure to comply had to be material. Ford asserts that the evidence at trial established that Premier unilaterally terminated the lease before to the end of its term, failed to pay property taxes for 2007 and 2008, and failed to pay the balance of the rent owed under the lease. Ford must demonstrate that the evidence conclusively established that Premier breached the lease or that the jury's adverse finding is so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust. *See Dow Chem. Co.*, 46 S.W.3d at 241–42; *Ellis*, 971 S.W.2d at 406–07.

As described above, Premier provided written notice to Ford on October 14, 2008 that it was terminating the lease. Premier's cited reasons for termination

included Ford's failure to timely remove the granite and gravel from the Leased Property and Ford's lockout of Premier from the property, and confiscation of Premier's pallets of pavestones.[15]  Premier emphasized that, as of the date of the letter, it had received no written notification from Ford of its intent to lock Premier out of the property or take possession of its materials, which violated the terms of the lease.  The evidence presented at trial supports Premier's claims that Ford breached the lease by failing to timely remove the granite and locking Premier out of the property.

Regarding the 2007 and 2008 property taxes, although Ford testified that he sent Premier the tax statements, the Sanfords both testified that Premier did not receive them.  The jury was free to credit the Sanfords' testimony and not to credit Ford's testimony in this regard.  Ford's lockout of Premier occurred before Premier was past due on any rent on the Leased Property.  Premier's termination letter was sent to Ford, and Ford received it, before Premier violated the lease due to unpaid rent.

Under the applicable standards of review, the evidence is legally and factually sufficient to support the jury's finding in response to Question 1 that Premier did not fail to comply with the terms of the lease. Accordingly, we overrule Ford's seventh issue.

### 7. Is the evidence legally and factually sufficient to support the jury's finding that Ford failed to comply with the terms of the lease?

In his first issue, Ford challenges the sufficiency of the evidence to support the jury's answer to Question 2.  In this question, the jury was asked, "Did Richard C. Ford fail to comply with the terms of the lease?"  The trial court instructed the

---

[15] Under the Texas Property Code, if a landlord unlawfully locks out a commercial tenant, the tenant may terminate the lease.  *See* Tex. Prop. Code Ann § 93.002(g)(1) (West 2013).

jury that the failure to comply had to be material. The jury answered "yes." Ford asserts that this question asked the jury whether his failure to remove the granite and gravel within the first ninety days of the lease term was a material breach of the lease agreement.

In his appellate brief, Ford baldly asserts that "Premier admittedly allowed Ford to keep the granite and gravel on the leased premises well past the initial 90 days, and admitted as much in writing," referring to the October 14, 2008 letter from Premier to Ford.[16] He next sets out various propositions of law, ending with the following quote from *Laredo Hides Co. v. H & H Meat Products Co.*: "A waiver of time of performance of a contract will result from any act that induces the opposite party to believe that exact performance within the time designated in the contract will not be insisted upon." 513 S.W.2d 210, 218 (Tex. App.—Corpus Christi 1974, writ ref'd n.r.e). Ford then states, "That is precisely what the facts and testimony show in this case." That is the entirety of his argument in support of this issue.

In short, Ford provides no legal analysis or record support for his assertions.[17] Even construing Ford's appellate brief liberally, we cannot conclude

---

[16] The only record references in this portion of Ford's brief are to the jury charge in the clerk's record and to Premier's October 14, 2008 letter in the reporter's record of trial exhibits.

[17] Timely performance is a material term if the contract expressly states that time is of the essence or if there is something in the nature or purpose of the contract and the surrounding circumstances that makes it apparent that the parties intended time to be of the essence. *Breof BNK Tex., L.P. v. D.H. Hill Advisors, Inc.*, 370 S.W.3d 58, 64 (Tex. App.—Houston [14th Dist.] 2012, no pet.). There is no dispute that Ford failed to remove the granite and gravel within the ninety-day period expressed in the lease. Further, Ford admitted that Sanford insisted on having this provision added to the lease; thus, Ford was aware that Premier needed the granite and gravel removed from the Leased Property quickly. Sanford testified that Ford's failure to remove the granite from the property completely prevented Premier from installing its permanent design displays, which was the purpose of Premier's leasing this property. Sanford and his wife both testified that they repeatedly requested that Ford remove the granite from the Leased Property, to no avail. Further, according to Sanford, when he finally demanded that Ford,

24

that he has briefed this issue adequately.[18]  *See* Tex. R. App. P. 38.1(i); *see also San Saba Energy L.P. v. Crawford*, 171 S.W.3d 323, 337 (Tex. App.—Houston [14th Dist.] 2005, no pet.).  Based upon this inadequate briefing, EMS has waived the complaints in his first issue.  *See id.*  Accordingly, we overrule Ford's first issue.

**B.    Did the trial court reversibly err in admitting over Ford's objection Premier's evidence of a prior lawsuit?**

In Ford's fourth issue, he asserts that the trial court abused its discretion in admitting evidence of a prior lawsuit over his objection.  A decision to admit or exclude evidence rests within the sound discretion of the trial court.  *Bay Area Healthcare Grp., Ltd. v. McShane*, 239 S.W.3d 231, 234 (Tex. 2007) (per curiam).  A trial court abuses its discretion when it acts without regard for guiding rules or principles.  *U-Haul Int'l, Inc. v. Waldrip*, 380 S.W.3d 118, 132 (Tex. 2012).  But, even if the trial court abuses its discretion in admitting certain evidence, we reverse only if the error was harmful—in other words, if it probably caused the rendition of an improper judgment.  *Id.*

The evidence about which Ford complains is Premier's Exhibit 36, a copy of a petition filed by Ford's prior tenants on the Leased Property.  This petition indicates that Ford's prior tenants sued him for breach of contract, breach of

---

comply with the lease and remove the granite and gravel, Ford locked Premier out of the Leased Property.  Although the Sanfords' testimony conflicted with Ford's on many of these factors, under both legal and factual sufficiency standards of review, the jury is the sole judge of witness credibility and the weight to be given the witnesses' testimony.  *See City of Keller*, 168 S.W.3d at 819; *GTE Mobilnet of S. Tex.*, 61 S.W.3d at 615–16.  The Sanfords' testimony adequately supports the jury's finding that Ford's failure to timely remove the granite and gravel from the Leased Property was a material failure to comply with the lease.

[18] Moreover, as discussed above, the jury was presented with a question regarding whether Ford's failure to comply with the lease was excused by, among other things, waiver.  The jury answered "no" to this question, and in Section II.3.(a). of this opinion, we determine that legally and factually sufficient evidence supports this finding.

implied warranty of quiet enjoyment, unjust enrichment, conversion, and attorney's fees. In this petition, the plaintiffs alleged that Ford "[o]n two separate occasions . . . had unlawfully locked Plaintiffs out of the Leased Premises and taken possession of Plaintiffs' valuable equipment, inventory and business records."

Premier sought admission of this evidence because Ford's counsel, during opening argument stated, "Mr. Ford got in a lawsuit and actually sued [the prior tenants] and they sued them [sic] back." Additionally, during direct examination, Ford testified about this suit as follows: "What had happened, the other people that were there, I had filed a suit against them. They moved out in the middle of the night; and then they countersued." Sanford's counsel asserted that this evidence was admissible to "impeach the fact that [Ford] says he works with his tenants." Ford's counsel responded by arguing that there were allegations in the petition that were "highly prejudicial," that the evidence was not relevant, and that it was hearsay. Sanford's counsel further asserted the following in support of admission of this evidence:

> Your Honor, I would also argue, for the benefit of the Court, under Rule 403, relevant evidence of prior misconduct is admissible to prove some material fact other than character, such as motive, opportunity and tenant's [sic] preparation of plan, identity or absence of mistake or accident. This is also Texas law. This is relevant.
>
> They opened the door. They made it an issue. The fact that they opened it, I'm allowed to argue. Whether it's a little bit or a lot, they opened the door; and I should be able to address it.

The trial court took the matter under advisement and recessed for the day.

The next morning, the trial court admitted the evidence, having determined that Ford had opened the door to it. But, the trial court stated that only those allegations having to do with entering the plaintiffs' offices without authority or

26

knowledge and unlawfully locking the plaintiffs' out of the premises were relevant. The remainder of the petition, the trial court ruled, was "unnecessary and unduly prejudicial." Accordingly, the petition was redacted substantially before it was admitted, with all but the first two paragraphs of factual allegations and all of the allegations under the causes of action blacked out.

Assuming, without deciding, that the trial court abused its discretion in admitting this evidence, we cannot say that admission of it probably caused the rendition of an improper judgment. *See* Tex. R. App. P. 44.1(a). In making this determination, we have evaluated the entire case, from voir dire to closing argument, considering the state of the evidence, the strength and weakness of the case, and the verdict. *See Reliance Steel & Aluminum Co. v. Sevcik*, 267 S.W.3d 867, 871 (Tex. 2008). We have evaluated the role the evidence played in the context of the trial, the efforts made by counsel to emphasize the evidence, and whether contrary evidence existed that the allegedly improperly admitted evidence was calculated to overcome. *See U-Haul Int'l, Inc.*, 380 S.W.3d at 136. We reach this decision for the following reasons.

Although Ford was questioned about the lawsuit itself by Premier's counsel, some of this questioning occurred before the admission of the petition. After the petition was admitted, counsel for Premier only briefly questioned Ford about the petition, focusing on the allegations of illegal lockout and the fact that the plaintiffs filed suit against Ford before Ford countersued. Premier's counsel questioned Ford about his counter-suit, which was admitted as Ford's Exhibit 36, and Ford testified that he filed his suit only "about an hour" after he had been sued. Premier's counsel further brought forth Ford's testimony that the two lawsuits had been consolidated and that they had been dismissed. On redirect examination, Ford's counsel emphasized that the lawsuit with Ford's prior tenants was never

tried and had been dismissed. Ford denied that any of the allegations in the suit were true. Importantly, Ford was permitted to call a rebuttal witness in the form of his current tenant, Anthony Santikos, specifically in response to the admission of Premier's Exhibit 36. Santikos testified that Ford was an excellent landlord and that he had never had any problems with him.

This evidence about which Ford complains played a small role in the context of the trial. Although Premier's counsel mentioned it briefly during closing, Ford's counsel countered his argument and emphasized that the statements in the petition were merely allegations, not facts. And, finally, as discussed above, the jury's findings in favor of Premier and against Ford are supported by legally and factually sufficient evidence.

Typically, a trial court's erroneous evidentiary ruling will not be harmful unless the judgment turns on the evidence that was erroneously excluded or admitted. *See Interstate Northborough P'ship v. State*, 66 S.W.3d 213, 220 (Tex. 2001). Under the circumstances in the case under review, we conclude that the judgment did not turn on this evidence.[19] *See id*. at 227. Nothing in the jury's verdict on which the judgment is based indicates that "something beyond the relevant evidence was guiding the jury's deliberations." *See Reliance Steel & Aluminum Co.*, 267 S.W.3d at 871. Accordingly, on this record, we conclude that any error in admitting Premier's Exhibit 36 was harmless. We overrule Ford's fourth issue.

_____

[19] Ford's argues that "[t]his evidence in day one of testimony was harmful error as the jury was prejudiced and failed to consider any other evidence and probably resulted in [an] incorrect verdict." However, this exhibit was not admitted on "day one of testimony"; rather it was admitted on the second day of testimony, *after* Ford already had testified regarding the prior lawsuit.

## III. CONCLUSION

The evidence is legally and factually sufficient to support the jury's findings challenged on appeal. Any error in the admission of the challenged evidence was harmless.

The trial court's judgment is affirmed.


/s/     Kem Thompson Frost
       Justice


Panel consists of Justices Frost, Brown, and Donovan.