

COURT OF APPEALS
EIGHTH DISTRICT OF TEXAS
EL PASO, TEXAS

| | | |
|---|---|---|
| HARSTAN, LTD, A TEXAS LIMITED PARTNERSHIP, and TBI, INC., ITS GENERAL PARTNER, | § § § | No. 08-12-00086-CV |
| | | Appeal from the |
| Appellants, | § | County Court at Law No. 3 |
| v. | § | of El Paso County, Texas |
| SI KYU KIM and SARAH KYUNG-AL KIM, | § | (TC# 2003-4083) |
| | § | |
| Appellees. | | |

## O P I N I O N

In this statutory fraud action involving the "as is" sale of commercial real property, Harstan, Ltd. and TBI, Inc., (collectively, "Harstan") appeal the trial court's judgment in favor of Si Kyu Kim and Sarah Kyung-Al Kim (collectively, "the Kims"). In three issues, Harstan argues that the "as is" nature of the sale precludes the Kims from recovering on their claim and that the evidence is legally insufficient to support the jury's verdict and damages award. We affirm.

**FACTUAL AND PROCEDURAL BACKGROUND**

In November 2001, the Kims purchased a dilapidated apartment complex from Harstan,

an entity owned and operated by Ronald Stading.[1]   Approximately seven months earlier, some of the buildings comprising the complex had sustained damage from severe windstorms.   At that time, the complex was owned by Roberto Lopez, who had purchased it six months earlier from Harstan's predecessor-in-interest, CEDB, LLC, an entity owned by Stading, a then-practicing attorney.   Lopez hired Antonio Velasquez, a registered professional civil engineer, to examine the extent of the damage sustained by the complex.   Velasquez concluded that Building B had "experience[d] . . . structural failure" and recommended that its roof be replaced and its exterior walls and second floor walkway be reinforced.   The Kims never received Velazquez's report, nor were its contents discussed with them.

Lopez, who was represented by Stading's law firm, filed an insurance claim.   Stading informed Lopez's insurance agent in May 2001 that tenants were vacating the property because of structural issues.   While his insurance claim was pending, Lopez received a letter from the City of El Paso in June 2001.   The letter stated, in relevant part, that an inspection had revealed the "structure" was unsafe and that, if Lopez failed to correct the violations identified in the letter, "the case will be submitted to the City Attorney's Office for condemnation proceedings." Stading received a copy of the letter, which, according to him, constituted the first written notice he had received from the City concerning the property's condition.

In July 2001, Stading submitted Velasquez's report to the insurance company in support of Lopez's claim.   Lopez, however, defaulted on his loan the following month, and Harstan acquired the complex by deed in lieu of foreclosure.   Shortly thereafter, Harstan listed the complex for sale.

As the new owner, Harstan continued to pursue the insurance claim filed by Lopez.

---

[1]  Stading died during the pendency of this appeal.

2

Stading forwarded several documents to the insurance company, including the June 2001 letter from the City.   Stading also hired Salvador Nuñez, a structural engineer, to inspect Building B. Nuñez, like Velazquez, concluded that Building B had sustained structural damage, and he recommended that a portion of the building's roof be replaced and that some of its masonry walls be reinforced.

On November 13, 2001, Mr. Kim submitted an offer to purchase the complex after his real estate agent showed it to him.   Before Stading accepted the offer or made a counteroffer on behalf of Harstan, he asked to meet Mr. Kim to discuss several issues, chief among them Mr. Kim's qualifications to operate an apartment complex and "the condition of the damage of Building B and the City and the threat of condemnation."   At this meeting, Stading explained to Mr. Kim that Nuñez's report was the basis for the repairs to Building B required by the City and represented to Mr. Kim that "[he] would correct Building B as required by the City . . . ." Following further negotiations, Mr. Kim signed a commercial property contract to purchase the complex "as is" for $515,000, based in part on Stading's representation "that at the time . . . all the repairs the City was requesting were done."

Ten days after Mr. Kim submitted his original offer, the parties closed on the complex. At closing, the Kims signed three documents—a purchase contract, a deed of trust, and a lien note—each containing an "as is" clause.   The "as is" clause in the one-page "Contract for Sale of Real Estate" provides:

> (1)   Buyer has had full opportunity to inspect the conditions of the units, knows the apartment complex is in need of repair and upgrade to meet City building code requirements and accepts the property '**AS IS – WHERE IS**', without representation of condition or occupancy.   [Emphasis in orig.].

The "as is" clauses in the deed of trust and lien note both state:

3

a.    The property is sold in an 'AS IS – WHERE IS' condition.    Grantor [Maker] acknowledges and represents he has had an opportunity to conduct extensive examination of the property, is aware of the property condition and repairs needed to the exterior and interior of the property, as well as the condition of the apartments contained within the complex.

Both the deed and trust also contain clauses representing the condition of the complex and, in particular, Building B:

Beneficiary [Payee] has disclosed to Grantor [Maker] the property condition and any repairs and claims exercised against the property prior to Grantor's [Maker's] purchase of said property.    The following Building 'B' repairs will be completed by Beneficiary: repairs and/or replace cinder block front [from] walls of three (3) units sustaining wind damage; install GFI electrical outlets in kitchen and baths of all eighteen (18) units; repair stairwell; replace electrical panels and meter boxes to all units.    The City of El Paso, when learning of alleged structural damage to Building 'B', initially sought the authority to condemn the building.    Structural Engineers and City Inspectors have since determined the building is in excellent structural condition [structurally sound] and have removed all concerns regarding the building.[2]

With regard to the repairs required by the City, Stading told Mrs. Kim at closing "that everything required by the City are all fixed and that the building's in very good condition."

Three days after closing, Stading sent the Kims a letter informing them that "the repairs to Building B have been completed" and that he "will soon complete modification and repair of the stairwell for Building B."   Shortly thereafter, the Kims listed the complex for sale because, among other reasons, they were experiencing difficulty in collecting rents.   The Kims received and accepted an offer in May 2002.   But the sale fell through primarily because they received a letter from the City of El Paso in June 2002 informing them that the "structure" was unsafe and that "[t]his case is being submitted to the City Attorney's office for condemnation proceedings."

Some of the code violations identified in this letter included:

---

[2]  The use of the brackets denotes the differences between the two documents.

b. The walls have not been maintained in a safe manner free of holes and cracks.

c. The roof structure has not been maintained free of defects that may cause leaks.

.            .            .

e. The electrical system is inadequate and does not meet minimum code requirements.

As Stading himself admitted at trial, the violations identified in the June 2002 letter are nearly identical to those identified in the June 2001 letter. Stading too received a copy of the June 2002 letter. He then wrote a letter to the Kims advising them that they had seven days to comply with the City's demands and, that if they did not, Harstan would initiate foreclosure proceedings. The Kims, who were unable to make the repairs, stopped making payments on the note in July 2002. In September 2002, Harstan initiated foreclosure proceedings. At the foreclosure sale held in October 2002, Harstan purchased the complex for $406,000.

The Kims subsequently filed suit against Harstan, asserting causes of action for common-law fraud and statutory fraud in a real estate transaction under Section 27.01 of the Texas Business and Commerce Code (Section 27.01). At trial, the parties disputed whether Harstan concealed material information and made material misrepresentations to induce the Kims to purchase the complex. Mr. Kim testified that, although he was aware of the dilapidated condition of the complex, including Building B, he relied on Stading's oral and written representations concerning the extent and status of the repairs required by the City in agreeing to purchase the complex. According to Mr. Kim, he bought the property "because [he] was not aware of the problem in the City." Like her husband, Mrs. Kim testified that she would not have bought the property if she had known "about the problems with the City" or "of any

5

other problems that existed on the property." The jury found that Harstan committed statutory fraud and awarded $141,000 in out-of-pocket expenses as damages.

## "AS IS" AGREEMENT

In its first issue, Harstan—citing *Prudential Ins. Co. of Am. v. Jefferson Assocs., Ltd.*, 896 S.W.2d 156 (Tex. 1995)—argues the Kims cannot recover on their statutory fraud claim as a matter of law because they accepted the apartment complex "as is" without representation of its condition despite knowing that the complex was in poor condition and in need of repair. We disagree.

In *Prudential*, a buyer purchased a commercial building "as is," and later sued the seller for DTPA violations, fraud, negligence, and breach of the duty of good faith and fair dealing, claiming the seller failed to disclose that the building contained asbestos. 896 S.W.2d at 159-60. The Supreme Court held the "as is" clause in the purchase agreement negated the buyer's claim that the seller's action caused his injury. *Id*. at 161. This is because by agreeing to purchase something "as is," a buyer agrees to make his own appraisal of the bargain and to accept the risk that he may be wrong. *Id*. at 160. As the court stated:

> The sole cause of a buyer's injury [when he agrees to purchase something 'as is'], by his own admission, is the buyer himself. He has agreed to take the full risk of determining the value of the purchase. He is not obliged to do so; he could insist instead that the seller assume part or all of that risk by obtaining warranties to the desired effect. If the seller is willing to give such assurances, however, he will ordinarily insist upon additional compensation. Rather than pay more, a buyer may choose to rely entirely upon his own determination of the condition and value of his purchase. In making this choice, he removes the possibility that the seller's conduct will cause him damage.

*Id*.

But the Supreme Court's holding in *Prudential* rests upon a "valid 'as is' agreement." *Id*. at 161. Recognizing this, the Court expressly stated that its holding was not intended to

6

"suggest that an 'as is' agreement can have this determinative effect in every circumstance. A buyer is not bound by an agreement to purchase something 'as is' that he is induced to make because of a fraudulent representation or concealment of information by the seller." *Prudential*, 896 S.W.2d at 162. To the contrary, the Court expressly recognized that "other aspects of a transaction may make an 'as is' agreement unenforceable. The nature of the transaction and the totality of the circumstances surrounding the agreement must be considered." *Id*. In undertaking this examination, courts must be mindful of the following:

> Where the 'as is' clause is an important part of the basis of the bargain, not an incidental or 'boiler-plate' provision, and is entered into by parties of relatively equal bargaining position, a buyer's affirmation and agreement that he is not relying on representations by the seller should be given effect. . . . We think it too obvious for argument that an 'as is' agreement freely negotiated by similarly sophisticated parties as part of the bargain in an arm's-length transaction has a different effect than a provision in a standard form contract which cannot be negotiated and cannot serve as the basis of the parties' bargain.

*Id*.

In sum, *Prudential* mandates that courts assess the validity of an "as is" agreement in light of three factors: (1) the sophistication of the parties; (2) the terms of the "as is" agreement; and (3) whether there was a knowing misrepresentation or concealment of a known fact. *Smith v. Levine*, 911 S.W.2d 427, 432 (Tex.App.--San Antonio 1995, pet. denied). When the agreement in this case is examined in light of these factors and compared to the agreement in *Prudential*, it is evident the "as is" provisions in the Kims' agreement are invalid as a matter of law.

In *Prudential*, both the buyer and seller were sophisticated parties. The buyer was "a knowledgeable real estate investor who owned an interest in at least thirty commercial buildings," the president of a commercial property management firm, and an "as is" purchaser of

7

"several large investment properties." *Prudential*, 896 S.W.2d at 159.  The seller was an insurance company that financed the construction of the building and acquired it four years later through foreclosure.  *Id*.  Unlike the parties in *Prudential*, the parties here did not share the same level of sophistication.  Harstan is in the business of providing real estate lending, and Stading is a licensed attorney who makes his living in the real estate industry and owns several businesses in that industry.  The Kims, on the other hand, were first-time property buyers.

In *Prudential*, the "as is" clause expressly disclaimed reliance upon any representation. The clause provided that the buyer "is taking the Property 'AS IS' with any and all latent and patent defects and . . . is not relying upon any representation, statements, or other assertion with respect to the Property condition, but is relying upon its examination of the Property." *Prudential*, 896 S.W.2d at 160.  This type of disclaimer, if it clearly and unequivocally expresses the parties' intent to disclaim reliance on the specific representations at issue, could potentially provide a seller with a viable defense to a buyer's claims for fraud, fraudulent inducement, and negligent misrepresentation, because reliance is a necessary element of each of those claims. *See Forest Oil Corp. v. McAllen*, 268 S.W.3d 51, 56 (Tex. 2008)(fraudulent inducement claim); *Schlumberger Tech. Corp. v. Swanson*, 959 S.W.2d 171, 179 (Tex. 1997)(fraudulent inducement and common-law fraud claims); *Henry Schein, Inc. v. Stromboe*, 102 S.W.3d 675, 686 & n.24 (Tex. 2002)(negligent misrepresentation claim).  Here, by contrast, the "as is" provisions in the contract for sale, deed of trust, and note are silent on the issue of reliance.  They merely state the property is sold "AS IS—WHERE IS."  Further, the Kims testified they in fact relied on Harstan's oral and written representations that all the repairs required by the City had been completed and, believing that no more repairs would be required

8

by the City, purchased the complex based on Harstan's representations.

In *Prudential,* there was no evidence the seller was actually aware of the presence of asbestos in the building or that it made an affirmative move to conceal the presence of asbestos. *Prudential,* 896 S.W.2d at 162. Indeed, the Supreme Court characterized the seller's alleged misrepresentations as "merely 'puffing' or opinion." *Id*. at 163. In this case, on the other hand, there is evidence Harstan knew the structural damage to Building B had not been repaired at the time the Kims purchased the building but nonetheless assured them that all repairs required by the City had been completed and that:

> The City of El Paso, when learning of *alleged* structural damage to Building 'B', initially sought the authority to condemn the building. Structural Engineers and City Inspectors have since determined the building is in excellent structural condition [structurally sound] and have removed all concerns regarding the building. [Emphasis added].

Because the "as is" agreement in this case, unlike that in *Prudential*, does not negate producing cause as a matter of law in the circumstances presented, *Prudential* is not dispositive of the outcome here.

Harstan's first issue is overruled.

## STATUTORY FRAUD

In its second issue, Harstan challenges the legal sufficiency of the evidence to support the jury's finding of statutory fraud. A plaintiff may recover for statutory fraud in a real estate transaction by establishing: (1) the defendant made a false, material promise to do an act; (2) with the intention of not fulfilling it; (3) for the purpose of inducing the plaintiff to enter into a contract; and (4) the plaintiff relied on the promise in entering into the contract. TEX.BUS.&COM.CODE ANN. § 27.01(a)(2)(West 2009). According to Harstan, "the controlling

9

question in this appeal is what existing material fact did [it] allegedly misrepresent and did the Kims justifiably rely on the alleged misrepresentation." By framing the issue in that manner, Harstan is arguing the Kims failed to adduce legally sufficient evidence on the elements of falsity and reliance. We disagree.

## 1. Reliance

Harstan asserts the Kims were required to prove that their reliance on its alleged misrepresentations was justifiable. Harstan maintains the Kims could not have justifiably relied on its representations because: (1) they failed to "do everything reasonably possible to learn all about the property;" and (2) because the representations were contradicted by the express terms of the documents signed by them. But the jury charge did not require that the Kims' reliance be justifiable.

The charge as submitted instructed the jury that "[s]tatutory fraud occurs when:"

(a) there is a false representation of a past or existing material fact, (b) the false representation is made to a person for the purpose of inducing that person to enter into a contract, and (c) the false representation is relied on by that person in entering into that contract.

At the charge conference, neither Harstan nor the Kims complained of the charge's failure to require justifiable reliance. Because no objection was raised to the instruction given the jury, the sufficiency of the evidence is measured against the trial court's charge as submitted to the jury, not some other unidentified law. *Wal-Mart Stores, Inc. v. Sturges*, 52 S.W.3d 711, 715 (Tex. 2001); *Osterberg v. Peca*, 12 S.W.3d 31, 55 (Tex. 2000). Therefore, in measuring the sufficiency of the evidence, we do not consider whether there is sufficient evidence of justifiable reliance. *Ghosh v. Grover*, 412 S.W.3d 749, 756 (Tex.App.--Houston [14th Dist.] 2013, no pet.); *Energy Maint. Servs. Grp. I, LLC v. Sandt*, 401 S.W.3d 204, 214 (Tex.App.--Houston [14th

10

Dist.] 2012, pet. denied). Given that, the absence of legally sufficient evidence to support a finding of justifiable reliance is immaterial and would not prevent the trial court from rendering judgment on the Kims' statutory fraud claim. *See Ghosh*, 412 S.W.3d at 756; *Sandt*, 401 S.W.3d at 214.

## 2. Falsity

Harstan argues there is no evidence "that [it] falsely represented all repairs the City required of the apartment complex were made[,]" and, "[m]ore importantly, the statements regarding repairs . . . were true." In support of its contention that it made no false representations, Harstan directs our attention to conflicting testimony by Mr. Kim regarding his assertion that Stading "[orally] represented at closing that all repairs the City required were made." According to Harstan, "the source of this alleged representation necessarily must be the documents[,] . . . [and] none of the documents contain this alleged representation[]" because they disclose the: (1) repairs made; (2) need for additional repairs; (3) threat of condemnation; and (4) structural soundness of Building B. In support of its argument that its representations were true, Harstan directs our attention to evidence that the City council removed from its agenda the condemnation proceeding mentioned in the June 2001 letter based on representations from City personnel that the "work as indicated here was completed . . . ." According to Harstan, this evidence conclusively proves the veracity of its representations because the Kims presented no evidence to the contrary.

But all of this evidence, including the alleged weakness in Mr. Kim's testimony, was presented to the jury, and therein lies the rub for Harstan. In essence, Harstan is asking us to invade the province of the jury and reweigh the evidence and reevaluate the credibility of

witnesses.   This we may not do.   In conducting our legal sufficiency review, we do not substitute our judgment for that of the jury, as it is the sole judge of the evidence's credibility and weight.   *City of Keller v. Wilson*, 168 S.W.3d 802, 819-20 (Tex. 2005).   Consequently, we must assume that, where reasonable, the jury resolved all conflicts in the evidence in a manner consistent with its verdict.   *Id.* at 820.   If reasonable jurors could resolve conflicting evidence either way, reviewing courts must presume they did so in favor of the prevailing party, and disregard the conflicting evidence in their legal sufficiency review.   *City of Keller*, 168 S.W.3d at 820.   Where conflicting inferences can be drawn from the evidence, it is within the province of the jury to choose which inference to draw, so long as more than one inference can reasonably be drawn.   *Id.*   Therefore, we must assume jurors made all inferences in favor of their verdict if reasonable minds could, and disregard all other inferences in our legal sufficiency review.   *Id.*

In light of the standards, the evidence adduced at trial was legally sufficient to support the jury's finding of falsity.

Although Mr. Kim contradicted his testimony by testifying that Stading did not speak to him at closing and that Stading told him and his wife at closing that all repairs required by the City had been completed, and although his credibility may have been called into question, the jury was free to believe some, none, or all of his testimony.   *City of Keller*, 168 S.W.3d at 819-20.   Furthermore, there is nothing inherently improbable or so clearly unbelievable about the inconsistency in Mr. Kim's testimony that reasonable minds could reach but one conclusion. For example, Mr. Kim may have been confused.   After all, he did not speak English well and required the services of a translator at trial.   He may even have confounded the events at closing with the events of a prior meeting.   After all, he dealt with Stading more than once.   In any

12

event, the jury also heard Mrs. Kim's testimony that Stading told her and her husband at closing that all repairs required by the City had been completed, and Harstan does not challenge the veracity of her testimony on appeal. The jury also heard Stading's testimony that he told the Kims at closing that the repairs required by the City were in progress and nearly complete.

The same principals articulated in the preceding paragraph apply to the testimony of the building inspector, Tom Maguire, that the condemnation proceeding was removed from the City council's agenda because "the work as indicated here was completed . . . ." While it is true, as Harstan points out, that Maguire's testimony was not controverted, the jury was free to disbelieve his testimony in light of the letter the Kims received in June 2002 threatening to condemn the complex due to the existence of hazards nearly identical to those identified in the 2001 letter. Again, the issue of inconsistencies in the evidence is a matter of credibility left to the jury's discretion. *City of Keller*, 168 S.W.3d at 819-20. Accordingly, Maguire's testimony does not constitute conclusive evidence of the contrary position urged by Harstan.

In sum, while the jury heard conflicting evidence, and may have chosen to accept as credible or reject as incredible some or all of any witness's testimony, the record presented does not support Harstan's arguments on appeal that the evidence is legally insufficient.[3]

Harstan's second issue is overruled.

---

[3] Evidence is legally insufficient if: (1) the record discloses a complete absence of evidence of a vital fact; (2) the court is barred by rules of law or of evidence from giving weight to the only evidence offered to prove a vital fact; (3) the evidence offered to prove a vital fact is no more than a mere scintilla; or (4) the evidence establishes conclusively the opposite of a vital fact. *Uniroyal Goodrich Tire Co. v. Martinez*, 977 S.W.2d 328, 334 (Tex. 1998), *cert. denied*, 526 U.S. 1040, 119 S.Ct. 1336, 143 L.Ed.2d 500 (1999); Robert W. Calvert, *"No Evidence" and "Insufficient Evidence" Points of Error*, 38 TEX.L.REV. 361, 362-63 (1960). Anything more than a scintilla of evidence is legally sufficient to support the finding. *Cont'l Coffee Prods. Co. v. Cazarez*, 937 S.W.2d 444, 450 (Tex. 1996); *Leitch v. Hornsby*, 935 S.W.2d 114, 118 (Tex. 1996). More than a scintilla of evidence exists if the evidence furnishes some reasonable basis for differing conclusions by reasonable minds about the existence of a vital fact. *Rocor Int'l, Inc. v. Nat'l Union Fire Ins. Co. of Pittsburgh, PA*, 77 S.W.2d 253, 262 (Tex. 2002). As revealed by the discussion above, more than a scintilla of evidence on the elements of reliance and falsity was adduced at trial.

**DAMAGES**

In its third and final issue, Harstan argues the evidence is legally insufficient to support the jury's award of $141,000 for the Kims' out-of-pocket expenses. We disagree.

### *Proper Measure of Damages*

Harstan first argues the trial court did not use the proper measure of damages in a statutory fraud claim.[4] According to Harstan, the correct measure of damages in this case is the difference between the value paid and the value received, and because "the Kims presented absolutely no evidence on the value of the apartment complex they received[,]" they were not entitled to "out-of-pocket" damages.[5]

"Out-of-pocket" damages are one of two measures of direct damages available in a fraud case under the common law; the other is "benefit-of-the-bargain" damages. *See Formosa Plastics Corp. USA v. Presidio Eng'rs and Contractors, Inc.*, 960 S.W.2d 41, 49 (Tex. 1998). But a plaintiff who proves fraud in connection with the purchase or transfer of property is entitled to recover not only direct damages but also restitutional damages for out-of-pocket expenses caused by his reliance upon the defendant's misrepresentation. *ISG State Operations, Inc. v. Nat'l Heritage Ins. Co., Inc.*, 234 S.W.3d 711, 718 (Tex.App.--Eastland 2007, pet. denied); *Hart v. Moore*, 952 S.W.2d 90, 97 (Tex.App.--Amarillo 1997, pet. denied); *Texas*

---

[4] A person who has been statutorily defrauded is entitled to "actual damages." TEX.BUS.&COMM.CODE ANN. § 27.01(b)(West 2006). The statute does not define the term "actual damages," but that term has been construed to mean "those damages recoverable under common law." *Rhey v. Redic*, 408 S.W.3d 440, 454 (Tex.App.--El Paso 2013, no pet.).

[5] In Question Number 3 of the charge, the jury was asked "[w]hat sum of money, if any, paid now in cash, would fairly and reasonably compensate . . . [the Kims] for their damages, if any, that resulted from . . . fraud . . . .?" The charge used the term "[o]ut-of-pocket expenses," but did not define that term for the jury. Harstan objected on the ground that the jury was not given the proper legal standard for measuring "out-of-pocket" damages in a fraud action and requested that the jury be charged using the proper standard. The trial court overruled Harstan's objection and denied its request.

14

*Commerce Bank Reagan Through Texas Commerce Bank Nat. Ass'n v. Lebco Constructors, Inc.*, 865 S.W.2d 68, 73 (Tex.App.--Corpus Christi 1993, writ denied), *overruled on other grounds by Johnson & Higgins of Tex., Inc. v. Kenneco Energy, Inc.*, 962 S.W.2d 507, 530 (Tex. 1998). Consequently, Texas law permits the recovery of out-of-pocket expenses in a statutory fraud case, and the Kims are not precluded *per se* from proving and recovering those expenses.

### Evidence of Damages

Harstan next argues the amount awarded for out-of-pocket expenses was not supported by the evidence. According to Harstan, "[t]he damages the Kims were seeking, excluding the unsubstantiated repair costs, totaled $127,738.33; not $141,000." The Kims computed their damages to be approximately $178,000, based on expenses attributable to their down payment on the complex (approximately $80,000), their monthly payments on the note (approximately $29,000), their monthly payments for insurance and property taxes ($24,000), and their cost for labor and repairs ($45,000). The jury's award of $141,000 fell within the range of evidence presented by the Kims. When the trial evidence supports a range of damages, an award within that range is an appropriate exercise of the jury's discretion, and we are not permitted to disregard the jury's award on the basis that the jury's reasoning is unclear. *SAS & Associates, Inc. v. Home Mktg. Servicing, Inc.*, 168 S.W.3d 296, 303 (Tex.App.--Dallas 2005, pet. denied). Because $141,000 is within the range of evidence presented to the jury, the evidence is legally sufficient to support the damages award.

Harstan does not argue the Kims' out-of-pocket expenses were not directly attributable to its misrepresentations and therefore not legally recoverable. Instead, Harstan contends the jury did not make a proper calculation of damages because Mr. Kim's testimony regarding the

15

$45,000 in expenses for labor and repairs was not substantiated by written documentation and because the Kims received tax benefits from the $24,000 they spent on insurance and property taxes. But Harstan cites no authority for its first assertion, and, with respect to its second assertion, Harstan is simply wrong. *See Lee v. Lee*, 47 S.W.3d 767, 780 (Tex.App.--Houston [14th Dist.] 2001, pet. denied)("[N]o authority supports an offset for tax benefits.").

Harstan also contends the damages were awarded on the basis of rescission, and because rescission was not pled, the trial court could not base its judgment on rescission. But the soundness of Harstan's argument hinges on the erroneous premise that the evidence was legally insufficient to support the jury's award of out-of-pocket expenses as restitutional damages. As discussed above, the evidence is legally sufficient to support the award.

Because the evidence is legally sufficient to support the full amount of actual damages awarded, we decline Harstan's invitation to "order a remittitur reducing the principal award from $141,000 to $80,000." *See* TEX.R.APP.P. 46.5 (remittitur is appropriate if trial court's judgment is reversed because of a legal error affecting only part of the damages awarded).

Harstan's third issue is overruled.

## CONCLUSION

Having overruled all three of Harstan's issues, we affirm the trial court's judgment.


July 25, 2014

                                                YVONNE T. RODRIGUEZ, Justice

Before McClure, C.J., Rivera, and Rodriguez, JJ.

16